637 P.2d 315 (1981)
Leon KUHN, Peter A. Morrell, and Richard Keven Wright, Petitioners,
v.
TRIBUNE-REPUBLICAN PUBLISHING COMPANY, doing business as The Greeley Daily Tribune and The Greeley Republican; and John Seelmeyer, Respondents.
No. 79 SC 160.
Supreme Court of Colorado, En Banc.
October 26, 1981.
Rehearing Denied November 16, 1981.
*316 Roath & Brega, P. C., Charles F. Brega, J. Stephen McGuire, Denver, for petitioners Kuhn and Morrell.
Robert E. Ray, Greeley, for petitioner Wright.
Southard & Ashlock, William H. Southard, Lawrence Ashlock, Greeley, Wahl & Gabel, Harold B. Wahl, Jacksonville, Fla., for respondents.
DUBOFSKY, Justice.
We granted certiorari to review the decision of the Colorado Court of Appeals in Kuhn v. Tribune-Republican Publishing Company, Colo.App., 637 P.2d 395 (1979). The Court of Appeals reversed a jury verdict for the petitioners Leon Kuhn, Peter A. Morrell, and Richard Keven Wright in their libel suit against the respondents Tribune-Republican Publishing Company, doing business as The Greeley Daily Tribune (Tribune), and John Seelmeyer, one of its reporters. We reverse the decision of the Court of Appeals and reinstate the jury verdict.
On January 8, 1976, the Tribune published an article (reproduced in the appendix to this opinion) written by reporter John Seelmeyer about the ski program run by the Greeley Department of Parks and Recreation (department). The article reported that two ski areas, Lake Eldora and Hidden Valley, sent complimentary season lift passes to the department. Trial testimony indicated that historically the department's winter program included group ski lift ticket purchases and transportation to one or more nearby mountain ski areas. In the fall of 1975, department officials chose the Lake Eldora and Hidden Valley areas for the group program. Seelmeyer's article implied that the areas were chosen because they provided ski passes for the personal use of the petitioners Kuhn, the director of the department, Morrell, the city manager, and Wright, an employee of the department and director of its ski program.
Based on the publication of this article, the petitioners filed a libel suit seeking actual and punitive damages from the respondents. The respondents moved for a summary judgment and directed verdict, claiming that statements in the article were substantially true, constituted fair comment, were privileged under the First Amendment to the United States Constitution standards for statements relating to a public official, and were made without actual malice. The district court denied the motions, and the jury returned a verdict for the petitioners in the amount of $69,500.[1] The trial court denied the respondents' motions for judgment notwithstanding the verdict and for a new trial.
The Court of Appeals reversed, holding that under the standards established by New York Times Co. v. Sullivan, 376 U.S. *317 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the petitioners, admittedly public officials, had failed to prove by clear and convincing evidence that the statements in the articles were false or defamatory, or published with actual knowledge that they were false or with reckless disregard as to whether they were false or not. The Court of Appeals ruled that the trial court should have entered summary judgment[2] or directed a verdict in favor of the respondents.
We disagree with the Court of Appeals' conclusion that the petitioners' evidence at trial was insufficient to persuade a reasonable factfinder clearly and convincingly that the respondents' publication was false and made with actual malice. To the contrary, we conclude that the petitioners proved that the respondents did not comply with the minimal standard of care prescribed by New York Times Co. v. Sullivan. Our review of the entire record assures us that the jury clearly could have been convinced that the respondents evidenced a reckless disregard for the truth or falsity of their publication.

I.
The newspaper article in issue is actually a hybrid of two stories. John Seelmeyer, the reporter, first intended to write about a grievance voiced at a city council meeting on January 6, 1976, by Richard Perchlik, the owner of the Sharktooth ski area near Greeley and a former mayor of Greeley. Perchlik complained that the department had placed newspaper and radio advertisements promoting their week-end bus trips to the Lake Eldora and Hidden Valley ski areas, but had not advertised the Sharktooth area. Seelmeyer told his managing editor he would prepare the story about Perchlik's complaint for the January 8, 1976 afternoon edition of the Tribune.
However, before Seelmeyer wrote the article, he spoke with a colleague, another reporter for the Tribune, who suggested that Seelmeyer investigate whether the department had received any free ski passes. The colleague, who himself had worked for the department some six years earlier, told Seelmeyer that a department supervisor, no longer employed by the department, had at that time received such a pass. Acting on this suggestion, Seelmeyer changed the thrust of his original city council meeting story, adding a section purportedly exposing corruption in the Greeley city government. Seelmeyer's allegation in this portion that the petitioners' receipt of free ski passes influenced them to include Lake Eldora and Hidden Valley ski areas in the city's ski program constituted the complained-of defamation of the petitioners.
At trial, Seelmeyer admitted that there was no particular need to publish the portion of the article concerning the ski passes on the day that he began his investigation. Nevertheless, he spent only two hours investigating and thirty minutes writing the story to meet the 11 a. m. press deadline for the January 8th edition. Seelmeyer's investigation included brief telephone conversations with Kuhn, the department director, and Wright, the department employee responsible for the ski program. Seelmeyer discussed the passes for four or five minutes with Wright, who told him the number of passes received and explained that they were used by bus supervisors and chaperones on the department-sponsored, week-end trips. At trial Wright testified that representatives from the ski areas had visited the department during the summer to provide information about their group discounts but that Seelmeyer did not ask him when the department received the passes or set up its program.
*318 Seelmeyer then called Morrell, the city manager, about the City of Greeley's policy respecting gifts. Morrell denied that anyone was "taking graft." Seelmeyer also anonymously spoke with the person who answered the phone in the city purchasing department about the dollar amount which would trigger its competitive bidding requirements. He then called two ski shops and Colorado Ski Country USA to ascertain the value of the passes. Other anonymous calls were made to Hidden Valley and Lake Eldora to determine if city officials had used the passes. Personnel at both ski areas told Seelmeyer that they did not maintain records that would yield the requested information. He called Dr. Perchlik, the owner of Sharktooth ski area, to inquire if the distribution of free passes was a common practice.[3]
Although uncorroborated by the information received from these sources, the following factual assertions appeared in Seelmeyer's article: that the dollar amount of skiing business directed to Hidden Valley and Lake Eldora was $7,600.00, that recreation officials accepted free passes, that the two resorts were chosen after the passes were left with city recreation officials, and that the program was subject to the city's competitive bidding requirements. At trial, Seelmeyer admitted that he did not ask when the passes were received, whether recreation officials personally used the passes, where the passes were kept, or if someone personally delivered them.[4] He explained that he did not want to ask city officials about personal use of the passes because he did not think they would be an objective source. He also testified that he worded the story so as to imply that recreation officials personally accepted the passes because, although he knew that the passes were given to the department, he wanted to "humanize" the story, and that when he wrote the story he did not know and did not care whether competitive bidding was required for a ski program or whether the city had any contractual obligations for the program. He admitted that he had no knowledgeable sources for much of his story.

II.
First Amendment questions of "constitutional fact" compel our de novo appellate review. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Walker v. Colorado Springs Sun, Inc., 188 Colo. 86, 538 P.2d 450 (1975). Our task is to ascertain whether sufficient clear and convincing evidence was adduced to permit the jury to conclude, after deciding questions of credibility and drawing permissible inferences in the petitioners' favor, that the respondents acted with reckless disregard for the truth. New York Times Co. v. Sullivan, supra; St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Rosenbloom v. Metromedia, Inc., supra; Alioto v. Cowles Communications, Inc., 519 F.2d 777 (9th Cir. 1975); Guam Federation of Teachers, Local 1581 v. Ysrael, 492 F.2d 438 (9th Cir. 1974), cert. den. 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974).
In New York Times Co. v. Sullivan, the Supreme Court substantially altered traditional defamation standards which require only that the plaintiff prove publication of false statements damaging to his reputation. In the New York Times case, the Court ruled that a public official suing a newspaper for libel must bear the burden of showing by clear and convincing evidence that the defamatory publication was made with "actual malice"that is, with knowledge that it was false or with reckless disregard of whether it was false or not. See, e.g., Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 *319 (1979); Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). This actual malice standard was meant to remove the inhibitory effect of defamation laws, in essence creating a constitutional privilege for good faith critics of public officials. In denying recovery where publication was made in good faith, even if the publication is erroneous and defamatory, St. Amant v. Thompson, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), the actual malice standard acknowledges that to some extent at least, "erroneous statement is inevitable in free debate...." New York Times Co. v. Sullivan, supra, 376 U.S. at 271-72, 84 S.Ct. at 721, 11 L.Ed.2d at 701.
Here, a jury could reasonably find that the publication failed even to meet this generous standard. Seelmeyer admitted that he had no bases for most of his erroneous statements, and that he failed to take the time to corroborate allegations made in the article, even though no particular urgency existed as to the time of publication. Actual malice may be inferred by the finder of fact if an investigation is grossly inadequate. Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Vandenburg v. Newsweek, Inc., 507 F.2d 1024 (5th Cir. 1975). In this context, a reporter's failure to pursue the most obvious available sources of possible corroboration or refutation may clearly and convincingly evidence a reckless disregard for the truth. Alioto v. Cowles Communications, Inc., supra.
Failure to verify statements made in the article meant that many of the "facts" about the ski passes "exposed" by the article were, essentially, fabrications. Fabrication of the facts in a newspaper report does not enjoy First Amendment protection. St. Amant v. Thompson, supra, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267-68 (1968); Garrison v. Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125, 133 (1964). Untruthful speech has never been protected for its own sake, Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); Gertz v. Robert Welch, Inc., supra, for "[n]either lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation." St. Amant v. Thompson, supra, 390 U.S. at 732, 88 S.Ct. at 1326, 20 L.Ed.2d at 267.
The evidence in this case was sufficiently clear and convincing that a jury could conclude that the respondents published the article with reckless disregard for the truth. When one fails to contact and question obvious available sources of corroboration, fabricates specific facts appearing in a story, and writes the story in a manner calculated to invite a factual inference that the newspaper has uncovered governmental corruption and bribery, one knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections.
The opinion of the Court of Appeals is reversed and the jury verdict is reinstated.
ROVIRA and LOHR, JJ., dissent.

APPENDIX

CITY'S RECREATION SKI PROGRAM DRAWS CRITICISM FROM PERCHLIK

By JOHN SEELMEYER

Tribune Staff Writer
About $7,600 worth of skiing business was directed to two Colorado resorts this winter after Greeley recreation officials accepted free passes valued at more than $700.
Even though the $7,600 figure is above the level ordinarily requiring competitive bidding, recreation officials didn't call for bids on the "Learn to Ski" program.
The Tribune learned the ski programs sponsored by the city were directed to Hidden Valley and Lake Eldora after salesmen for the two resorts left season passes with city recreation officials.
*320 The Hidden Valley pass is worth $85 while the Lake Eldora pass is worth $150.
In addition, the two resorts arranged to give recreation officials a one-day tow ticket for every 20 persons who take the city's ski bus on weekend trips. On a typical weekend, that means officials receive two Lake Eldora passes valued at $7 each and five Hidden Valley passes worth $5.75 each.
Over the 10-week program, that amounts to one-day passes worth $485.
A rival ski operator, Richard Perchlik of the Sharktooth area west of Greeley, questioned the recreation department's procedures at Tuesday's city council meeting.
Perchlik charged his area wasn't included in a city brochure listing ski programs because Kevin Wright, recreation official who runs the ski program, mistakenly believed Sharktooth wasn't in operation.
Sharktooth was listed on an insert to the brochure after Perchlik pointed out the error in November.
Later, Perchlik charged, the recreation department ran newspaper and radio ads promoting programs at Lake Eldora and Hidden Valley, but again ignoring Sharktooth.
"I don't expect the city to run ads for my business or any other business," Perchlik said in an interview Thursday. The ads cost $164, according to Recreation Director Leon Kuhn.
Perchlik, former Greeley mayor, also said he believes the city's ski business should have been opened for competitive bidding.
City policy calls for contracts involving more than $2,000 to be advertised for bid.
Perchlik said bids on the "Learn to Ski" program probably could have resulted in lower prices for the 320 persons who are expected to participate this year.
Recreation officials said their selection of the two mountain resorts represented an attempt to provide the highest quality program.
"We just provide the highest quality activity at the best price we get it," said Wright who is in charge of the program.
He said selection of the areas was based on their proximity to Greeley and the quality of program offered.
Wright said the recreation department is approached by several ski areas every summer and salesmen usually leave season passes.
The arrangement for one-day passes allows supervisors traveling on the ski buses to ski free, Wright said.
At Tuesday's council meeting, City Manager Pete Morrell said selection of Lake Eldora and Hidden Valley was "a judgment call by Leon (Kuhn) on the program we should participate in."
Council members scolded Morrell and Kuhn for their handling of the ski program and told them to include Sharktooth in future advertising.
On the issue of receiving free passes, Morrell said later the city doesn't have a written policy on gifts.
He said several businessesincluding movie theatersoffer passes and other gifts to city officials in most cities. Morrell said each official makes his own decision whether to keep the gift.
He added, however, "We're not taking any graft."
ROVIRA, Justice, dissenting:
I respectfully dissent.
The petitioners, seeking to vindicate their reputations, would have us reinstate a judgment for actual and punitive damages awarded to them on their claim of being libeled. The respondents, seeking to protect their right to publish, would have us sustain a reversal of that judgment on the grounds that the article was not defamatory and, even if it were, there was an absence of clear and convincing evidence of actual malice.
The case before us reflects a conflict between competing claims and rights; but if we are to protect and encourage "uninhibited, robust, and wide-open" debate, New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686, 701 *321 (1964), we should affirm the Colorado Court of Appeals. Self-government rests on a bedrock of information freely received and freely given. There can be little doubt that a democratic society cannot retain its vitality unless its citizens have access to information which can only be obtained from a free and unfettered press.
The evidence adduced at trial reflects that the Greeley Department of Parks and Recreation (Department) had historically made arrangements for ski area ticket purchases and bus transportation to a mountain ski area for the citizens of Greeley. In the fall of 1975 Kuhn, the director of the Department, and Wright, the director of the ski program, decided that the Department's ski program for 1975-76 would include two ski areasLake Eldora and Hidden Valley. Subsequently, four complimentary season passes were received from Hidden Valley[1] and one from Lake Eldora. These passes were issued to "Greeley Rec" or "Greeley Civic Center" and were used on the weekends by unpaid volunteer chaperones and bus supervisors who accompanied the skiers. The passes were never used by the petitioners.
In December 1975 and January 1976 the Department placed newspaper advertisements for its ski program in the Greeley Daily Tribune. It failed to include a ski area known as "Sharktooth" which was owned by Richard Perchlik, a former mayor of Greeley. As a result, at a Greeley City Council meeting on January 6, 1976, Perchlik complained about the failure to include his ski area in the advertisement and suggested an alternative method by which the city might run its ski program, i.e., by competitive bidding.
Seelmeyer had been assigned to report on city council meetings and was present at the January 6 meeting, as were Kuhn and Morrell. In response to Perchlik's comments, Kuhn and Morrell explained the Department's policies regarding ski areas and affirmed their desire to treat all citizens fairly.
On the morning following the city council meeting, Seelmeyer had a conversation with Peters, a fellow reporter, who had worked for the Department prior to any of the petitioners' being employed by the city. Peters told Seelmeyer that a Department supervisor had received free ski passes when he was employed there.
As a result of his conversation with Peters, Seelmeyer, on January 8, telephoned the Department and spoke briefly with Kuhn and at greater length with Wright about the ski program. In his conversation with Wright he inquired as to whether the Department had received any free ski passes, and Wright answered in the affirmative.
Later in the morning, Seelmeyer talked to Morrell, the City Manager, about the city's gratuity policies, and Morrell stated that he "didn't believe" that such a policy existed. During the course of this conversation, and as a result of the questions being asked of him, Morrell told Seelmeyer that city officials were not taking graft, and this statement was quoted in the article.[2]
Seelmeyer discussed the information he had obtained from the petitioners with the managing editor of the Greeley Daily Tribune, who authorized Seelmeyer to make long distance telephone calls to obtain further information.
In an effort to establish the value of the ski passes, Seelmeyer telephoned "Ski Country U.S.A." in Denver and received some information about the value of the passes. He also called Hidden Valley and Lake Eldora *322 in an attempt to identify who used the passes. He was told that the users of the passes could not be identified by name since only the number on the pass was recorded when it was used.
Following up Perchlik's suggestion at the city council meeting that competitive bidding should be used in the ski program, Seelmeyer telephoned the Greeley purchasing department and inquired about competitive bidding requirements of the city. He also reviewed the City Charter which required competitive bidding for purchase contracts of materials, supplies, and equipment in excess of two thousand dollars.
As a last step in his investigation before writing his article, Seelmeyer telephoned Perchlik and inquired about distribution of ski passes by ski areas to city officials. Perchlik told him that Sharktooth area ski passes had been given to many officials, including Kuhn. This fact, which the petitioners argue demonstrates that receipt of ski passes did not influence the choice of ski areas, was not included in the article.
Petitioners argue that the gravamen of the article's defamatory falsehood was that recreation officials were influenced to include certain ski areas in the city's ski program by their personal receipt of free passes from those ski areas. They emphasize here, as at trial, that Seelmeyer had no evidence that the passes had been given to recreation officials rather than the Department and that the Department's receipt of the passes was not in violation of any city policy.
The respondents argue that the article is substantially correct because the city did direct ski business to Hidden Valley and Lake Eldora; ski passes had in fact been sent to the Department; the passes had value; the gravamen of the recreation officials' actions was not in their using the passes, but their accepting and retaining them in violation of the city's policy against the acceptance of gratuities; and the dollar figure in the first paragraph of the article, while incorrect as shown by the evidence at trial, was nevertheless substantial. Respondents concede that on the basis of information first learned during depositions or at trial, Seelmeyer would have changed certain facts reported in the article. However, they contend that Seelmeyer believed the story to be true when he wrote it and, despite its alleged errors, there was no showing that he had any knowledge of its falsity or serious doubts about its truth before publication.
Any analysis of a libel action brought by a public official against a newspaper must necessarily begin with New York Times Co. v. Sullivan, supra. There the United States Supreme Court, recognizing that the line between speech unconditionally guaranteed and speech which may legitimately be regulated is difficult to ascertain, determined that an appellate court must make an independent examination of the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect.[3] The Court also held that the constitutional freedoms of speech and press prohibit a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves by clear and convincing evidence that the statement was made with actual malicethat is, with knowledge that it was false or with reckless disregard of whether it was false or not.
In Garrison v. Louisiana, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964), the Court noted that since erroneous statement is inevitable in free debate, and must be protected if the freedoms of expression are to have the breathing space they need to survive, only those false statements made with a high degree of awareness of their probable falsity may be the subject of either civil or criminal sanctions.
In subsequent decisions the United States Supreme Court stated that reckless disregard is not measured by whether a reasonably prudent man would have published, or *323 would have investigated before publishing; that while reckless disregard bears a resemblance to gross negligence, it is in reality much more; and reckless disregard must reflect a conscious awareness of probable falsity. Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967). The test of actual malice is whether the defendant knew or had reason to suspect that his publication was false. The inquiry focuses on the defendant's conduct and state of mind at the time of publication. See Herbert v. Lando, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).
There can be little doubt that the standards established by the United States Supreme Court were based upon an acceptance of the principle that where the reputational interests of a public official conflict with the constitutional command of free speech and free press the constitutional right must predominate.
The test of whether the publisher acted with actual malice should not be applied mechanistically or grudgingly, but in a manner which recognizes that vigorous public debate and scrutiny of public officials is an end to be desired. Application of the test should recognize the paramount public interest in a free flow of information to the citizens concerning public officials. Garrison v. Louisiana, supra. Freedom of expression must be given the wide latitude it needs to survive regardless of the truth, popularity, or social utility of the statements made.
My examination of the record and recognition of the change of the law of defamation into a subject of constitutional imperatives[4] leads me to conclude that the petitioners did not establish, by clear and convincing evidence, that the respondents acted with actual malice in publishing the article complained of. This is especially true as to Morrell, the City Manager, who was not a recreation official and who made no claim that he was misquoted except as to the statement "that the city doesn't have a written policy on gifts."[5]
The majority opinion states that since the article "implies" that the ski areas were chosen because they provided ski passes to Morrell, as well as to Kuhn and Wright, this is sufficient evidence to support a judgment for actual and punitive damages by Morrell. In my view there is no reference, either express or implied, to Morrell with regard to the ski passes and the directing of business to the ski areas, and there is no actionable statement as to him in the article.
The record discloses that the respondents had obtained their information from reputable sources, that this information formed the basis of the article in dispute, and that they had attempted to verify the information they published.
There are factual errors contained in the article. For example, at trial the respondents were unable to substantiate that the city of Greeley directed $7,600 worth of skiing business to Hidden Valley and Lake Eldora. The uncontradicted evidence established that the actual ski business directed by the city was worth approximately $2,000. More significantly, the season passes referred to in the first and third paragraphs of the article were received after, rather than before, the decision had been made by the Department to use the Lake Eldora and Hidden Valley ski areas.
Viewing the evidence in a light most favorable to petitioners, they proved that the respondents' publication contained some inaccurate and misleading statements. However, the publication of false facts is not actionable against a defendant who had no knowledge of the falsity or probable falsity of the underlying facts at the time of publication. See Hotchner v. Castillo-Puche, 551 *324 F.2d 910 (2d Cir. 1977). Actual malice is not a proposition that can be supported by a normative conclusion that the publisher should have known of the falsity of the statement. Rather, evidence of the publisher's subjective awareness is required. Vandenburg v. Newsweek, Inc., 507 F.2d 1024 (5th Cir. 1975). Proof of negligence, inaccuracy, or misstatement is not sufficient to warrant a fact finder's conclusion that a writing was published with actual malice. St. Amant v. Thompson, supra; Curtis Publishing Co. v. Butts, supra.
Errors of fact, to some degree, are inevitable in the reporting of events which are at all complex.
"A rule compelling the critic of official conduct to guarantee the truth of all his factual assertionsand to do so on pain of libel judgments virtually unlimited in amountleads to ... `self-censorship.' Allowance of the defense of truth, with the burden of proving it on the defendant, does not mean that only false speech will be deterred. Even courts accepting this defense as an adequate safeguard have recognized the difficulties of adducing legal proofs that the alleged libel was true in all its factual particulars.... Under such a rule, would-be critics of official conduct may be deterred from voicing their criticism, even though it is believed to be true and even though it is in fact true, because of doubt whether it can be proved in court or fear of the expense of having to do so." New York Times Co. v. Sullivan, supra, [376 U.S.] at 279, 84 S.Ct. at 725, 11 L.Ed.2d at 706 (footnotes omitted).
Contrary to the view expressed in the majority opinion, my examination of the record does not disclose the clear and convincing evidence of actual malice necessary to support a libel judgment in favor of these public officials.
My dissent should not be read as condoning negligent or second-rate reporting. Responsible and conscientious members of the press should be as sensitive to the importance of accurate reporting as those about whom they report.
A press which is protected by a standard of proof which requires actual malice to be established by clear and convincing evidence should adopt and maintain standards which warrant this unique protection.
I do not believe that the respondents can, consistent with the First Amendment, be charged with a libel judgment in this case; therefore, I would affirm the judgment of the Colorado Court of Appeals.
I am authorized to say that Justice LOHR joins me in this dissent.
NOTES
[1] The petitioners' award was divided by the jury as follows:

(1) For Kuhn: $15,000 actual damages }
 > from Tribune
 5,000 punitive damages }
 1,000 actual damages }
 > from Seelmeyer
 500 punitive damages }
 _______
 $21,500
(2) For Morrell: $20,000 actual damages }
 > from Tribune
 5,000 punitive damages }
 1,000 actual damages }
 > from Seelmeyer
 500 punitive damages }
 _______
 $26,500
(3) For Wright: $15,000 actual damages }
 > from Tribune
 5,000 punitive damages }
 1,000 actual damages }
 > from Seelmeyer
 500 punitive damages }
 _______
 $21,500

[2] We held in DiLeo v. Koltnow, Colo., 613 P.2d 318 (1980), that the usual rule disfavoring summary judgment may be altered in defamation cases involving media defendants in order to prevent the chilling effect on media communication of protracted litigation. However, after the Court of Appeals ruling in this case, we held in Manuel v. Fort Collins Newspapers, Inc., Colo., 631 P.2d 1114 (1981), that the First Amendment interest in avoiding the chilling effect of lengthy litigation does not require that a publisher's motion for summary judgment be reconsidered on appeal in cases where a trial on the merits has already taken place. Consequently, the trial court's denial of the respondents' motion for summary judgment was not subject to reversal by the Court of Appeals.
[3] Seelmeyer did not include information from Perchlik that Perchlik gave free Sharktooth passes to all public officials in the Greeley area.
[4] It was established at trial that no recreation officials used the passes, which were kept in the department's safe, and that the passes were mailed to the department in late October and early November, a month or more after the city had notified Lake Eldora and Hidden Valley that they would participate in their group skiing program.
[1] The passes from Hidden Valley Ski Area were accompanied by a letter dated October 24, 1975, from its General Manager addressed to Kuhn and stated in pertinent part: "Dear Leon, Please find enclosed four complimentary season passes to Hidden Valley for the 1975-76 winter ski season. The season passes are to be used by yourself and your staff members whenever desired...." This letter was not known by, or made available to, Seelmeyer when he wrote his article on January 8, 1976.
[2] The article also quoted Morrell as saying the city "doesn't have a written policy on gifts." Evidence adduced at trial established that the city did have a written policy prohibiting its employees from accepting gifts.
[3] See Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967).
[4] See Eaton, The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer, 61 Va.L.Rev. 1349 (1975).
[5] See footnote 2, supra. Morrell sought to show that as city manager he was responsible for all departments, and therefore the public regarded him as a recreation official.