The LIVING WILL CENTER, a
Limited Liability Company,
Plaintiff–Appellant,

v.

NBC SUBSIDIARY (KCNC–TV), INC.
and Suzanne E. McCarroll,
Defendants–Appellees.

No. 92CA0139.

Colorado Court of Appeals,
Division III.

Feb. 11, 1993.

As Modified on Denial of Rehearing
March 11, 1993.

Certiorari Granted Sept. 13, 1993.

Bloom Murr & Accomazzo, P.C., Eric P. Accomazzo, Edward Dale Parrish, P.C., Dale Parrish, Denver, for plaintiff-appellant.

Holme Roberts & Owen, Kevin Michael Shea, Jon Bernhardt, Denver, Anne H. Egerton, Marjorie Nieset Neufeld, Burbank, CA, for defendants-appellees.

Opinion by Judge BRIGGS.

Plaintiff, The Living Will Center, appeals the summary judgment dismissing its complaint against defendants, NBC Subsidiary (KCNC–TV), Inc., and one of its reporters—Suzanne McCarroll. Plaintiff's complaint included claims of libel, violation of the Colorado Consumer Protection Act, disparagement of plaintiff's business products and services, and tortious interference with a prospective economic advantage and business opportunity. Plaintiff contends the trial court erred in dismissing the complaint on the basis that statements in two television broadcasts referring to the sale of plaintiff's products as a "scam" and to its customers as being "taken" were mere hyperbole and that the broadcasts were constitutionally protected. We reverse and remand for further proceedings.

Plaintiff is a Colorado company in the business of selling products and services relating to advance decisions and directions

for health care. Plaintiff asserts it provides customers with a thoroughly comprehensive, up-to-date, single source of information, forms, and services to enable individuals to make decisions and give directions in advance on choices for medical treatment in the event the individual becomes unable to do so.

Plaintiff began its business operations in 1991 with $200,000 in capital. In April of that year, its employees began a $60,000 television advertising campaign. Plaintiff's products and services were marketed as a package for $29.95.

The package consists of a current Colorado living will form; a durable power of attorney for health care form; a medical directive form which gives directions to a treating physician regarding specific medical treatment for differing medical conditions; and a personal identification card which contains a reduced copy of the living will, the location of the owner's living will, the name and address of the person's doctor, and information regarding the holder of the durable power of attorney, for use in the event of an emergency.

As part of the package, plaintiff includes the customer's name and address in a central registry by which people with living wills and related documents can be apprised of any changes in laws or medical technology affecting their living wills. In addition, the customer receives a subscription to a quarterly newsletter with information about any changes in the law and other developments relating to living wills and the legal right to make decisions about dying. The package includes information about the forms and services.

The subject of plaintiff's action are two different news reports about its product which were televised on successive days on KCNC's 4:00 p.m. news program. The full transcripts of the newscasts are included in the Appendix.

In the first newscast the newscaster introduced the segment by describing plaintiff as a company "capitalizing" on the living will trend. The reporter, defendant McCarroll, stated that some in the business

of medical ethics say this is "really exploiting people's fear of death." After noting that the staff at the University of Colorado Health Sciences Center had sent out 10,000 living will forms free of charge, there was a clip from a videotaped interview with plaintiff's .president in which he stated his form was "done on a stronger piece of paper."

Following this, the reporter stated that plaintiff's president had admitted his form was the same as one supplied free by hospitals and libraries, but that he claimed his print was bigger and that it came with a quarterly newsletter, a wallet identification card "so people know you have a living will," and a form for appointing a durable power of attorney. She then reported that the same form for a durable power of attorney was available free of charge at the C.U. Health Sciences Center. This segment concluded with the reporter noting that the packet includes a medical directive form, then cutting to a clip of plaintiff's president explaining this form was not a legal document, but a "road map for the patient."

Defendants juxtaposed this portion of the telecast with the brief commentary of a Denver doctor employed at the University of Colorado School of Medicine, who was represented on the broadcast as a "medical ethicist." His first statement on the telecast was, "I think it's a scam." The reporter then summarized the doctor's opinion: "He says the medical directive and power of attorney forms are unnecessary, certainly not worth paying for." Then the doctor stated, "[a]nd they will send in $29.95 and what they get back is they've been taken— is what it amounts to—totally taken."

The reporter later stated, "[T]hose in the medical ethics community say the living will forms offered free of charge are really all you need. If there's anything else you wish to add, simply add it." After listing other sources for the living will forms, the broadcast concluded by pointing out plaintiff's president was not a doctor or lawyer, but rather an "entrepreneur."

The telecast the next day included a brief summary of portions of the first report.

Defendant McCarroll stated that the day before "we showed you one company in town that charged $29.95 for a living will kit. Now that kit includes a living will, a durable power of attorney, and a medical directive form."

The reporter represented that the doctor interviewed in the prior report had stated that the medical directive form was unnecessary. She did not mention that the doctor had also described the durable power of attorney form as unnecessary. She did report that "as of today" University Hospital was no longer providing the form for a durable power of attorney.

The remainder of the telecast consisted of more information regarding other entities which allegedly provided forms supposedly like plaintiff's, but again at little or no cost. Those entities included Porter Memorial Hospital, Denver Public Library, Harvard Medical School, Journal of American Medical Association, University Hospital, and Colorado Health Science Center.

Plaintiff claims on appeal that within 24 hours after the telecasts its dollar sales volume plummeted 65% and has never recovered.

After plaintiff filed its complaint, the court granted defendants' request for a stay of discovery pending a ruling on their motion for a protective order. Defendants then filed a motion to dismiss on the basis that the facts asserted in the broadcasts were substantially true and the opinions expressed were constitutionally protected.

In dismissing the complaint the trial court determined that, as a matter of law, the telecasts related to a matter of public interest and that, as a result, the requirements of falsity and actual malice or reckless disregard of the truth applicable to the claim for defamation were applicable to all of plaintiff's claims. Plaintiff has not challenged these determinations on appeal. The court then concluded that the substance or gist of the telecasts was true and that the statements that plaintiff's business was a "scam" and that people were being "taken" were constitutionally protected opinion supported by disclosed facts.

## I.

Plaintiff contends the trial court erred in concluding that the substance or gist of the telecasts neither contain nor imply any provably false factual connotation. We agree.

■ We note at the outset that the issue of falsity is separate from the issue of whether the broadcasts were defamatory. For example, while falsity is typically an issue in both claims for defamation and trade disparagement, because the claims differ in other respects, *compare Burns v. McGraw–Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983) *with Teilhaber Manufacturing v. Unarco Materials Storage*, 791 P.2d 1164 (Colo.App.1989), a false statement may provide the basis for a claim of trade disparagement but be insufficient to state a claim of defamation. *See* Restatement (Second) Torts § 623A comment g (1976) ("Although it might be possible to imply some accusation of personal incompetence or inefficiency in nearly every imputation directed against a business or a product, the courts have insisted that something more direct than this is required for defamation.")

The trial court dismissed plaintiff's complaint based solely on its conclusion that the broadcasts did not imply any statement of material fact susceptible of being proved false. This is the only issue the parties have addressed on appeal, and our review will be limited to that issue.

### A.

The United States Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) rejected the creation of an artificial dichotomy between "opinion" and fact. It concluded that, regardless of characterization as opinion or fact, a statement on matters of public concern must be provable as false before there can be liability under state defamation law, at least when a media defendant is involved. Loose, figurative, or hyperbolic language is entitled to full constitutional protection if, when considered in

context, it would not be understood in its literal sense and does not contain a provably false factual connotation.

Our supreme court had earlier reached a similar conclusion in determining that a statement can support a claim for defamation only if the statement can be interpreted as a statement of fact susceptible to proof or disproof. *Burns v. McGraw–Hill Broadcasting Co., supra.*

■ Whether plaintiff's allegations are sufficient to remove the telecasts from the protection of the First Amendment is a question of law which requires that we conduct an independent examination of the record. *See Milkovich v. Lorain Journal Co., supra; Kuhn v. Tribune–Republican Publishing Co.,* 637 P.2d 315 (Colo.1981). To determine whether the telecasts contain any provably false factual connotation we must consider their circumstances and factual context. *See Burns v. McGraw–Hill Broadcasting Co., supra.*

■ In regard to those circumstances, we note that there is no evidence that the group which heard one broadcast was identical to the group that heard the other. Each is therefore a single publication. *See* Restatement (Second) of Torts § 577A and comment d (1977). Thus, as counsel for both parties conceded during oral argument, each broadcast must be separately analyzed.

### B.

■ The words "scam" and "taken" in the first broadcast, considered alone, do not necessarily imply facts susceptible of being proved false. *See Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724 (1st Cir.1992). However, the trial court's conclusion that the statements and the telecast are constitutionally protected is correct only if neither the statements in the context of the entire telecast nor the substance or gist of the telecast including the statements contain or imply any provably false factual connotation. *See Milkovich v. Lorain Journal Co., supra; Burns v. McGraw–Hill Broadcasting Co., supra.* The resolution of this issue requires that

we first determine the substance or gist of the first newscast.

Defendants described plaintiff in the initial telecast as an "entrepreneur," selling a package of information, forms and services that was "unnecessary," the sale a "scam," amounting to people being "totally taken." A jury could properly find that the substance or gist of these statements, together with the other assertions in the telecast, is that a company with no expertise is packaging and selling information, forms, and services which, individually or collectively, are not worth paying anything for, because everything in the package can be obtained at little or no cost elsewhere or is unnecessary to meet the needs of the public. The report also implies that the content and purpose of anything in plaintiff's package worth paying for has been fully disclosed during the telecast.

Plaintiff points out that the telecast fails to disclose why the conclusion is reached that plaintiff's entire package is unnecessary. The argument, in effect, is that the telecast implies material assertions susceptible of being proved false, and that the substance or gist which can reasonably be inferred from these assertions together with the other statements in the telecast is susceptible of being proved false. We agree.

In the telecast, defendants acknowledge that plaintiff's package includes a quarterly newsletter, but there is no indication of its contents or purpose. There is no reference at all to the central registry. The trial court in its finding describes the newsletter as being "of unknown content and nature" and the central registry as being "of unknown nature." However, in plaintiff's verified complaint the purpose of the newsletter is specifically described as informing customers "on a regular basis of any … changes in living will laws, and other developments in issues generally relating to living wills and one's legal right to decide about dying." The central registry is described in the complaint as fulfilling the need to apprise customers "of any changes in laws or medical technology affecting their living wills."

The trial court's dismissal of plaintiff's complaint was also based in part on its finding that the living will form and the durable power of attorney were available from University Hospital free of charge. However, plaintiff in its verified complaint alleges that, in fact, neither the University Hospital nor the C.U. Health Sciences Center at any time provided the form for a durable power of attorney.

The telecast mentions the medical directive that plaintiff provides and offers a doctor's opinion that it and the power of attorney forms are "unnecessary, certainly not worth paying for." The reporter later in the broadcast states that the living will forms offered free of charge "are really all you need. If there's anything else you wish to add, just add it." At no time is the content or purpose of the medical directive or the power of attorney forms disclosed so that a viewer can form an independent opinion about their utility. Under these circumstances, a jury could find the implication to be that no reasonable consumer informed of the content and purpose of these forms would find them useful and could further find this connotation to be false.

The telecast also implies that the living will form available from other sources mentioned in the story was the equivalent of plaintiff's. Plaintiff argues that none except that available from University Hospital and C.U. Health Sciences Center was the equivalent. The others were out of date because they did not reflect the current version of the Colorado living will statute, which had been amended in 1989, including the new statutory requirement that two physicians must certify the patient's incapacitation for a period of seven consecutive days. *See* § 15–18–104, C.R.S. (1987 Repl.Vol. 6B). Plaintiff's form also includes three choices concerning artificial nourishment and hydration as set out in the current version of the same statute. Only the forms from University Hospital and C.U. Health Sciences Center contained these choices.

There is a mention in the telecast of a "wallet i.d. card so people know you have a living will." However, there is no indication of its contents or other purposes.

Finally, in describing plaintiff as an entrepreneur and not a doctor or lawyer, there is no indication of the time and effort plaintiff spent in consulting with attorneys and medical specialists in developing its package of product, which plaintiff alleges was substantial. A jury could reasonably find that this implies plaintiff had accumulated no specialized knowledge about living wills and related documents and that the implication is false.

There is no requirement that there be a disclosure of every fact involved in an investigative story. Here, however, the telecast implied that the content and purpose of everything in plaintiff's package that might be worth paying anything for, as well as the facts relevant to plaintiff's knowledge and expertise in the area, had been fully disclosed during the investigative story. Under the record before us, a jury could properly find that implication to be false.

In sum, the statements referring to plaintiff's business as a "scam" and its customers being "totally taken" were in the context of a supposedly objective investigative story which contains or implies material assertions susceptible to being proved false. The substance or gist of the story which a jury could reasonably infer from these statements and assertions is susceptible of being proved false. Thus, the telecast does not fall within the protection of the First Amendment for statements containing no provably false factual connotation. The complaint as to this telecast therefore should not have been dismissed on the basis of lack of provable falsity.

C.

Plaintiff argues that the second broadcast is misleading in several respects, including the failure to indicate the differences between its forms and those provided by others. For example, plaintiff alleges that the living will forms of Porter Hospital, Denver Public Library, Journal of

American Medical Association, and Harvard Medical Center did not reflect the waiting period in the current Colorado statute or the choices in regard to nutrition.

Plaintiff also alleges in its verified complaint that a form for a durable power of attorney was never available at University Hospital, C.U. Health Sciences Center, or Porter Hospital. In addition, while the medical directive was described as unnecessary, its contents and purpose were not disclosed. A jury again could find that this statement implies that no reasonable customer informed of the content and purpose of the medical directive would find it useful, and could further find that this implication is false. Finally, defendants in this report, in addition to not disclosing the content and purpose of each of the forms discussed, failed even to mention the personal identification card, the central registry, or the newsletter.

The substance or gist of the second telecast is therefore the same as the first: a company with no expertise is packaging and selling information, forms, and services which, individually or collectively, are not worth paying anything for, because everything in the package can be obtained at little or no cost elsewhere or is unnecessary to meet the needs of the public. The report again implies that everything in plaintiff's package worth paying anything for has been fully disclosed during the telecast.

We again conclude that the broadcast contains or implies material assertions susceptible of being proved false, and the substance or gist of the story which a jury could reasonably infer from these assertions and other statements in the telecast is susceptible of being proved false. Therefore, the complaint should not have been dismissed on the basis of lack of provable falsity.

## II.

Plaintiff also complains that the trial court's stay of discovery erroneously denied it the opportunity to obtain discovery and present material pertinent to defen-

dants' motion. We address the issue because it is likely to arise again on remand.

The court's reasoning in granting the stay was that information plaintiff sought on defendants' state of mind was immaterial to the court's analysis of whether the contents of the broadcast were true or constituted protected opinion. Thus, discovery on culpability was not pertinent to the resolution of the motion to dismiss.

■ To the extent plaintiff seeks discovery pertaining to defendants' state of mind, we agree with the court's conclusion that such discovery is not pertinent to the issue of falsity. However, on appeal, plaintiff also asserts that it should be entitled to discovery regarding whether or not the broadcasts were false.

■ Plaintiff did not raise this argument with the trial court until it filed a motion for reconsideration after the court had entered its order dismissing the complaint. Nevertheless, because the issue may arise on remand, we address it here.

We are mindful of the cost to a defendant of immediate unlimited discovery and the court's goal in entering the stay of discovery of not unnecessarily wasting the time and resources of the parties or the court. However, on the issue of falsity plaintiff apparently seeks production only of several hours of original unedited video and audio tapes and internal production memoranda and records. We agree that these materials may contain information which is relevant to the issue of falsity and admissible in evidence or reasonably calculated to lead to the discovery of admissible evidence. *See* C.R.C.P. 26. Limited discovery on the issue of falsity is therefore appropriate. Any issues regarding privilege or the need for protective orders as to this or other discovery plaintiff seeks regarding falsity are for the trial court to determine in the first instance.

The judgment dismissing plaintiff's complaint based on lack of provable falsity is reversed, and the cause is remanded for further proceedings consistent with this opinion.

CRISWELL, J., concurs.

ROTHENBERG, J., dissents.

Judge ROTHENBERG dissenting.

I respectfully dissent.

In a well-reasoned opinion, the trial court stated *inter alia:*

[S]tatements of opinion relating to matters of public concern are not actionable if the opinion has no provably false factual connotation or truthful facts supporting the opinion [are] set forth. (cites omitted).... Here the court concludes as a matter of law that the use of the words 'scam' and 'taken' in the context of the whole telecast show [the doctor's] words to be rhetorical hyperbole and protected opinion, not assertions of fact. [The doctor's] expertise is disclosed as well as his interest and concern in the area. The underlying basis of his opinions are disclosed in that [the doctor] and defendant McCarroll state that all of the services and products provided by the plaintiff are not necessary to accomplish the desired ends of allowing individuals to predetermine the nature and extent of medical care and treatment....

There exists substantial authority from a number of jurisdictions consistent with the trial court's analysis. *See Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (use of the word "traitor" in literary definition of a union "scab" not basis for defamation action since it was "merely rhetorical hyperbole"); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) (newspaper's reference to local developer's negotiating position as "blackmail" was merely rhetorical hyperbole, and not libelous); *Phantom Touring, Inc. v. Affiliated Publications,* 953 F.2d 724, 728 (1st Cir.1992) (critic who described musical comedy version of Broadway show as a "rip-off, a fraud, a scandal, a snake-oil job" did not commit libel because commentary was "figurative and hyperbolic" and there is "no objective evidence to disprove it"; terms "fake" or "phony" similarly unprovable since they "admit of numerous interpretations"); *McCabe v. Rattiner,* 814 F.2d 839, 842 (1st Cir.1987) ("The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false."). *See also Ollman v. Evans,* 750 F.2d 970 (D.C.Cir.1984) for exhaustive discussions of the differences between opinion and fact in the context of a libel action brought by a public figure against a newspaper. *But see Sunshine Sportswear & Electronics, Inc. v. WSOC Television, Inc.,* 738 F.Supp. 1499, 1506 (D.S.C.1989) (terms "scam" and "rip-off" have ascertainable meaning and can be identified as either true or false).

These on-point holdings and the trial court's reasoning convince me that the dismissal of plaintiff's claims should be affirmed. Further, although two discrepancies do exist between the trial court's findings and the information presented by the plaintiff, I consider them relatively minor in the context of this dispute.

## APPENDIX

### Transcript of First News Broadcast—4/23/91

Newscaster Larry Green: And there's lots of news still ahead in our next half hour. Living wills give you the chance to have control over your own life but should you pay to get one?

[Commercial Break and News]

Larry Green: Living wills have become a popular and legal way of maintaining some control over your dying days. They allow you to make difficult life and death decisions. Do you want to be kept alive on life support systems? Artificially fed? Hospitals and libraries throughout the metro area offer living will forms free of charge. And now, a new Denver company is capitalizing on the living will trend, charging $29.95. Is it worth it? News 4's Suzanne McCarroll is here with more on the story.

Defendant Suzanne McCarroll: Well, Larry, some in the business of medical ethics say that this is really exploiting people's fear of death. But the president of the company says it's an al-

 truistic service providing forms for people to make difficult decisions. He says $29.95 is a nominal fee.

In the past six months the staff at the CU Health Sciences Center has sent out 10,000 living will forms free of charge; you need only provide a stamp. Just this month Merrill Hastings has opened the Living Will Center. He too will send out living will forms. He'll provide the stamp, you need to provide $29.95.

**Merrill Hastings (Living Will Center Representative):** ... It's done on a stronger piece of paper ...

**Suzanne McCarroll:** Hastings acknowledges that his living will form reads the same as the form hospitals and libraries offer free of charge. But he points out the print is bigger and with it comes a quarterly living will newsletter and this wallet I.D. card so that people know you have a living will. The $29 packet also comes with this form for appointing a durable power of attorney—someone to make final decisions for you if you can't. This same form is available free of charge at the CU Health Sciences Center. And next, the packet includes this medical directive.

**Merrill Hastings:** ... and on it is a choice of the treatments that you may wish to take or not wish to take—and how long you want to take them for. This is not a legal document—it's a road map for the patient.

**Dr. Frank Marsh:** ... I think it's a scam....

**Suzanne McCarroll:** Dr. Frank Marsh is a medical ethicist. He has reviewed these forms and is disgusted. He says the medical directive and power of attorney forms are unnecessary—certainly not worth paying for.

**Dr. Frank Marsh:** ... And they will send in $29.95 and what they get back is they've been taken—is what is amounts to—totally taken!

**Suzanne McCarroll:** Marsh teaches a course to medical students at CU's Med School. In it he advocates the use of living wills, but he does not advocate paying for the practice.

**Dr. Frank Marsh:** It's a way to make money. They seize on the term "will" and they look at it and they think that—well this is cheap, I don't have to go to a lawyer—$29.95 looks cheap for a will and they don't have to pay a penny—not one red cent for it.

**Suzanne McCarroll:** Now, those in the medical ethics community say the living will forms offered free of charge are really all you need. If there's anything else you wish to add, simply add it. You don't need a special form to do that. And, again, the Harvard Medical School sends out a living will packet for $5.00. The American Medical Association has information on living wills. And in Denver the CU Hospital, CU Health Sciences Center, will send you out a living will form free of charge. Again, that local address is: University Hospital, in care of Living Wills, 4200 East Ninth Avenue, Box A092, Denver, Colorado 80262. And from the people we talked to it's not that there's anything wrong with these forms, they're just saying that $29.95 is an unnecessary charge for a service you can provide or find free of charge in the community.

**Larry Green:** Does Hastings have a medical or legal background?

**Suzanne McCarroll:** Neither, he's kind of an entrepreneur and has done various business ventures, but he admits he's not a lawyer nor a doctor.

**Larry Green:** Let's give him the benefit of this doubt then. Will he hold your hand over the telephone while you're trying to fill out the forms? Is there some sort of information that comes along, besides just the form?

**Suzanne McCarroll:** Well it's the form and a letter of direction. It's sort of a toll free number you call, you get your form mailed out, but they don't provide over-the-phone, ongoing counseling.

Larry Green: Okay. All right. So we still have a chance though to get this for $29.95 cheaper from University officials here?

Suzanne McCarroll: Right.

Larry Green: All right. Thank you very much.

Transcript of Second News
Broadcast—4/24/91

Newscaster Kristin McColoskey: And there's lots of news still ahead in our next half hour. Wondering how you can get a living will and a durable power of attorney for free? We'll show you coming up.

[Commercial Break and News]

Larry Green: Yesterday, we told you about a company that will sell you living will forms for $29.95. And we told you you could get those forms for free at the University of Colorado Health Science Center. Well, a lot has happened since our report yesterday and Suzanne McCarroll is here now to tell us all about it.

Suzanne McCarroll: Well, Larry, yesterday we showed you one company in town that charged $29.95 for a living will kit. Now that kit includes a living will, a durable power of attorney and a medical directive form. Now, the durable power of attorney form allows you to name someone to make medical decisions should you not be competent. The medical directive form lets you list what medical procedures you would or wouldn't want.

We then talked to Dr. Frank Marsh, a medical ethicist at University Hospital. He told us the medical directive form was unnecessary, but you can pick up the other two forms free of charge at the hospital. This is where the story gets complicated.

Merrill Hastings who runs the company that charges $29.95 for the forms called us and challenged us saying you couldn't get those forms at University Hospital. We checked back with University Hospital this morning—a spokesman there said that as of today they have reversed their position. As of this afternoon, they are no longer providing the durable power of attorney form—only the living will form. But there is a way to get all the necessary forms free of charge or for just a nominal fee. You don't have to pay $29.95.

At Porter Memorial Hospital you simply walk in the lobby and pick up the durable power of attorney form and the living will form off the rack. Hospital personnel say the forms are free and very popular.

Ed Christian (Porter Memorial Hospital): ... feel very important that patients have the right to control the destiny of their lives. And if we can encourage them to take that action, then it works out well for everybody.

Suzanne McCarroll: The Denver Public Library has the forms available at the Social Science desk on the third floor of the main library downtown. The forms are in this book. You need only come up with $.20 to xerox the two pages. Ask the librarian for help if you need it.

Marilyn Chang (Librarian): If you were to telephone us, we could fax a copy to one of our branches and you could pick it up there. So we make it very convenient for you.

Suzanne McCarroll: You can also write Harvard Medical School for living will forms. They will send you a living will form, a medical directive and a durable power of attorney form. The packet is $5.00 for two sets. The forms have been published by the Journal of the American Medical Association.

It also includes this medical directive which walks you through a variety of medical scenarios. You can check the medication or treatment you would or wouldn't want.

Again, University Hospital is still providing living will forms free of charge. A spokesperson there says they are no longer handing out those durable power of attorney forms because it enables

someone to carry out your wishes. The hospital staff says while they're valid forms you should first talk to an attorney before making such an important decision. But those forms are still available elsewhere.

If you want the living will form and the durable power of attorney form go to Porter Hospital or your local library. If you want all three forms, including that medical directive, you can write to Harvard Medical School, and of course Harvard Medical School, Boston, Massachusetts.

Larry Green: All right. Thank you very much.

Suzanne McCarroll: Mm. hmm.