Yvonne C. BURNS, individually and as parent and natural guardian of Kevin Burns and Renne Burns, Steven Burns, an individual, and Bryan Burns, an individual, Petitioners,

v.

McGRAW–HILL BROADCASTING COMPANY, INC., a New York corporation, Respondent.

No. 81SC121.

Supreme Court of Colorado, En Banc.

Feb. 22, 1983.

**1354**

David L. Kofoed, Roger T. Castle, Denver, for petitioners.

Sherman & Howard, Lee Dale, Denver, for respondent.

ERICKSON, Justice.

An appeal was taken from a jury verdict in favor of the plaintiffs in a defamation action. The court of appeals reversed, 632 P.2d 280 (Colo.App.1980), and we granted certiorari. We reverse the court of appeals and return this case to the court of appeals with directions to remand to the district court for proceedings in accordance with the views set forth in this opinion.

## I.

### Facts

On July 4, 1972, Sergeant Jack Burns of the Denver Police Department Bomb Squad was severely injured when a bomb which he was attempting to disarm exploded. Sergeant Burns lost the major parts of both hands, suffered a loss of hearing and partial blindness.

Sergeant Burns and his wife, Yvonne Burns, had experienced marital difficulties, and Mrs. Burns filed for divorce several months prior to the explosion. The couple reconciled shortly before the accident and remained together for some time after the accident while Mrs. Burns cared for her injured husband. However, in 1974, two years after the accident, Mrs. Burns sought and was granted a divorce.

On April 7, 1976, the respondent, McGraw-Hill Broadcasting Co., aired a program entitled "dangerous occupations" on its local affiliate, KMGH–TV. The program was broadcasted as a part of the 5:00 P.M. news and contained a report on the misfortunes of Sergeant Burns. The reporter, Marion Brewer, broadcasted a story which contained the following language:

"[B]omb squad was called out to do its job, take care of an explosive device and keep it from harming any property or individuals. It seemed to be a routine bomb call; the explosive device was found wired to a car. But the bomb squad's experts were confident they could handle it. As the officers went to work, Sgt. Jack Burns was in charge. That was the last bomb he'll ever work on. It exploded ... taking all of his right hand, parts of his left hand, most of his eyesight and much of his hearing. In addition, *his wife and five children have deserted him since the accident.* He's not sure he and his family adequately assessed what might be the consequences of an accident on the job with the bomb squad and he advises those interested in a dangerous occupation to do so."

(Emphasis added.) The statement referring to Mrs. Burns and the five children was deleted from the station's 10:00 P.M. broadcast of the story.

Mrs. Burns filed a defamation and invasion of privacy action against McGraw-Hill, alleging that the use of the word "deserted" in the broadcast was defamatory and caused her and her children to suffer damages to their reputation and to be held up to hate, contempt, and ridicule in their community.

The jury returned a general verdict awarding the petitioners a total of $175,000 —$75,000 for Mrs. Burns and $25,000 for each of the four children. After the verdict was announced, McGraw-Hill filed motions for a directed verdict, new trial, and judgment notwithstanding the verdict. The trial court denied the motions but ordered that the petitioners accept a remittitur reducing the award to $25,000 for Mrs. Burns and to $5,000 for each of the children or face a new trial. The petitioners accepted the remittitur "under protest" as a method for contesting the validity of the trial court's order. McGraw-Hill appealed the remitted judgments and petitioners cross-appealed the order of remittitur.

## II.

### Remittitur

#### A.

#### Appealability

The petitioners accepted the trial court's remittitur "under protest" and argue that they should be able to cross-appeal a remittitur if the other party appeals the final judgment. The traditional rule is that a party who elects to accept a remittitur may not appeal the propriety of the trial court's order. *Colorado City v. Liafe,* 28 Colo. 468, 65 P. 630 (1901). The rationale is that a party who is satisfied with a judgment should not be allowed to perfect a no-risk appeal and that a party who in fact disputes the remittitur may seek a retrial and thereafter appeal. If the party receives a favorable verdict on retrial, the necessity of appeal is eliminated, and judicial time and resources are not wasted.

■ We agree that the direct appeal of a remittitur by a party who accepts the trial court's offer is not appealable. However, we conclude that a party who accepts a remittitur under protest may cross-appeal the order when the party who benefits from it appeals for different reasons.

The federal courts have on occasion permitted direct appeals of an order granting a remittitur. *See, e.g., Bonn v. Puerto Rico International Airlines, Inc.,* 518 F.2d 89 (1st Cir.1975); *United States v. 1160.96 Acres of Land,* 432 F.2d 910 (5th Cir.1970); *Gorsalitz v. Olin Mathieson Chemical Corp.,* 429 F.2d 1033 (5th Cir.1970); *Steinberg v. Indemnity Insurance Co. of North America,* 364 F.2d 266 (5th Cir.1966); *Delta Engineering Corp. v. Scott,* 322 F.2d 11 (5th Cir.1963). The rationale of the federal courts is that the remittitur is sufficiently adverse to the appellant to warrant appeal and that judicial resources would be more efficiently utilized by allowing appellate review of the order at the earliest possible time. *See* Note, *Appealability of Judgments Entered Pursuant to Remittitur in Federal Courts,* 1975 Duke L.J. 1150. However, the United States Supreme Court held in *Donovan v. Penn Shipping Co.,* 429 U.S. 648, 97 S.Ct. 835, 51 L.Ed.2d 112 (1977) (per curiam), that a party may not appeal a remittitur order he has accepted in federal courts.

Some states allow appeal of remittiturs by statute or by rule. *See, e.g.,* Neb.Rev. Stat. § 25–1929 (1979); Tenn.Code Ann. § 20–10–102 (1980 · Repl.Vol. 4); Tex.R. Civ.P. 328. In *Mulkerin v. Somerset Tire Service, Inc.,* 110 N.J.Super. 173, 264 A.2d 748 (1970), the New Jersey Supreme Court adopted the rule that a plaintiff may cross-appeal a remittitur which has been accepted. The court reasoned that if the traditional rule was to conserve judicial resources and to encourage finality of judgments, these policy arguments would be frustrated if the case were appealed by the other party. The Wisconsin Supreme Court declared that it would be unfair to allow a defendant who receives the benefit of remittitur to also have the sole opportunity to appeal all issues without the risk that the original verdict might be reinstated. *Plesko v. Milwaukee,* 19 Wis.2d 210, 120 N.W.2d 130 (1963). *See generally* Note, *Remitting Parties' Right to Cross-Appeal,* 49 N.C.L. Rev. 141 (1970). ·

In our view, cross-appeals of remittiturs should be permitted when the party for whom the remittitur was granted appeals on other grounds. The reasons supporting the traditional rule are not present when the plaintiff is forced into the position of responding to an appeal by the defendant. Judicial economy is best achieved by reviewing the remittitur judgment at the same time other issues in the case are resolved. A new trial may be completely avoided if the trial court's order is found erroneous and the original verdict is reinstated. Moreover, such a rule encourages the defendant to pursue only meritorious appeals because of the chance that the appellate court may reinstate the original verdict while ruling against the appellant on all other issues.

#### B.

#### Amount of Verdict

■ The rule in Colorado is that a "verdict in a personal injury case is not to be set

aside unless the damages awarded are grossly and manifestly excessive, or, on the other hand, are grossly and manifestly inadequate." *Gibbons v. Choury,* 169 Colo. 267, 269, 455 P.2d 649, 650 (1969); *Odell v. Public Service Co.,* 158 Colo. 404, 407 P.2d 330 (1965); C.R.C.P. 59(a)(5). Likewise, in a defamation case, we will not set aside the jury's determination of damages unless the damages are "so outrageous as to strike everyone with the enormity and injustice of them, and so as to induce the court to believe that the jury must have acted with prejudice, partiality or corruption." *Riss & Co. v. Anderson,* 108 Colo. 78, 85, 114 P.2d 278, 281 (1941); *Tunnel Mining and Leasing Co. v. Cooper,* 50 Colo. 390, 115 P. 901 (1911).

 In a case where general damages are granted, a new trial and not remittitur is the proper remedy if passion and prejudice have affected the verdict. *Tunnel Mining and Leasing Co. v. Cooper, supra; Davis Iron Works Co. v. White,* 31 Colo. 82, 71 P.2d 384 (1903); *Hartford Fire Insurance Co. v. Kolar,* 30 Colo.App. 1, 488 P.2d 1114 (1971). The jury's award can be reduced only if it is found to be excessive and unjust. *Mayer v. Sampson* 157 Colo. 278, 402 P.2d 185 (1965); *Riss & Co. v. Anderson, supra.* As we said in *Marks v. District Court,* 643 P.2d 741, 744 (Colo.1982), "where the trial judge has made a finding that the excessive jury verdict resulted from bias, prejudice, and passion, firmly established precedent requires that a new trial on all issues be granted." That rule is premised on the notion that the entire fact-finding process may have been tainted by the same extraneous factors which led to the excessive verdict.

 It is also well-recognized in Colorado that a trial court has the "power to grant a new trial under C.R.C.P. 59 or in the alternative, to deny the new trial on the condition that the plaintiff will agree to a remittitur of the amount of the damages found by the court to be excessive." *Id.* The

option of remittitur or new trial is permissible in cases where the trial court considers the damages manifestly excessive, C.R.C.P. 59(a)(5), but cannot conclude that the damages were a product of bias, prejudice, or passion. *See Leo Payne Pontiac, Inc. v. Ratliff,* 178 Colo. 361, 497 P.2d 997 (1972); *Kresse v. Bennett,* 151 Colo. 549, 379 P.2d 807 (1963).

 The trial court in this case never made a finding that the jury's verdict was influenced by passion, prejudice, or corruption. The court did express the opinion that it was "shocked" by the size of the verdict, and that the verdict was not appropriate based on the evidence adduced at trial. In our view, the trial court is required to grant a new trial if the verdict was a product of bias, prejudice, or passion. *Marks v. District Court, supra.* If, instead, the trial court concludes that the verdict was not influenced by extraneous considerations, but that the damages were manifestly excessive in light of the evidence presented at trial, then the trial court's order of remittitur should stand. Of course, if the trial court on reconsideration concludes that neither bias, prejudice, nor passion influenced the jury verdict and that the verdict was not manifestly excessive, then the jury verdict should be permitted to stand. We therefore remand the case back to the trial court for a finding either that the verdict was a product of passion or prejudice; or that the verdict was manifestly excessive based on the evidence presented at trial; or that the verdict should be permitted to stand. The trial court shall then either grant a new trial, or permit the verdict or the remitted judgment to stand.

### III.

### *Fact/Opinion*

The court of appeals relied on *Bucher v. Roberts,* 198 Colo. 1, 595 P.2d 239 (1979), and *Burns v. Denver Post, Inc.,* 43 Colo. App. 325, 606 P.2d 1310 (1979),[1] to reach the

---

1. Mrs. Burns brought suit against both the Denver Post and McGraw-Hill. The suit was severed for trial and both jury verdicts were

subsequently appealed. Thus, the court of appeals heard two different appeals entitled *Burns v. Denver Post, Inc.:* 43 Colo.App. 325,

conclusion that the allegedly defamatory statements were constitutionally protected expressions of opinion, and said:

"As we read *Burns* and *Bucher,* we may not inquire into what meaning is most *naturally or reasonably* attributable to a publisher's use of given language. The question, rather, is whether the words used are used in such circumstances and are of such a nature as to admit of only one meaning. Here, we cannot say categorically that the word 'deserted,' as used in the context of the broadcast at issue, carries solely opprobrious connotations."

*Burns v. Denver Post, Inc.,* 632 P.2d 280, 281 (Colo.App.1980) (emphasis in original). We believe the court of appeals' statement of what constitutes protected opinion is overly broad and unnecessarily extends protection to the expression of a defamatory opinion which may be actionable.

A statement may be defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement (Second) of Torts* § 559 (1976); C.J.I. —Civ.2d § 22.8 (1980); *see also Knapp v. Post Printing & Publishing Co.,* 111 Colo. 492, 144 P.2d 981 (1943); *Republican Publishing Co. v. Mosman,* 15 Colo. 399, 24 P. 1051 (1890); W. Prosser, *Handbook of the Law of Torts* 739 (4th ed. 1971). The jury found, and the record contains evidence, that Mrs. Burns was damaged by the news story's description of her relationship with her former husband. In the context of the broadcast, Mrs. Burns was portrayed in a manner which suggested that she had unjustifiably and malignantly abandoned her severely injured and partially blind and deaf husband.

The finding of a defamatory connotation by the jury was a reasonable conclusion based on the story which was broadcasted. A finding that the language used was defamatory must be predicated on the context of the entire story and the common meaning of the words utilized. *Cianci v. New Times Publishing Co.,* 639 F.2d 54 (2d Cir.1980); *Restatement (Second) of Torts* § 563 (1977). The word "deserted," when used in reference to the marital and family relationship, commonly means "to abandon without warning, permission, or right" or "to leave in the lurch." *Webster's New International Dictionary* (2d ed. 1961). *See also Black's Law Dictionary* 532 (rev. 4th ed. 1968) ("'deserted" means abandonment occurring without legal justification either in the consent or the wrongful conduct of the other party). "Deserted," when used in the everyday sense, is a term of derision. When juxtaposed in a sympathetic news story about a tragically injured police officer, the term can be interpreted as attributing to Mrs. Burns and the children an act of the "the basest ingratitude ... deserving the contempt of all right minded people." *Burns v. Denver Post, Inc.,* 632 P.2d at 282 (Ruland, J., dissenting) (quoting *Smith v. Smith,* 73 Mich. 445, 41 N.W. 499 (1889)). A reasonable jury could conclude that the term was defamatory in the context of McGraw Hill's news broadcast.[2] In addition, the defamatory language does not have to prejudice the plaintiff in the eyes of a majority of the community. It is only necessary that the plaintiff be prejudiced in the eyes of a "substantial and respectable minority" of the community. *Restatement (Second) of Torts* § 559, comment e (1976); *Burrascano v. Levi,* 452 F.Supp. 1066 (D.Md.1978), *aff'd,* 612 F.2d 1306 (5th Cir.1979); W. Prosser, *supra* at 743.

606 P.2d 1310 (1979) (Denver Post), and 632 P.2d 280 (Colo.App.1980) (McGraw-Hill).

2. Justice Dubofsky's dissent would inexplicably grant reporters broad discretion in determining the meaning of potentially defamatory language. We do not believe that the word "deserted" can be wrenched from the context of the facts of this case and thereby rendered innocuous. Most words have multiple definitions; the inquiry must focus on the manner and context in which they are used. Uncritical reliance on dictionary definitions oversimplifies the task. Furthermore, to excuse the language in this case as an example of "a sort of rhetorical hyperbole" is again to ignore the context and effect of the story.

Nevertheless, McGraw-Hill argues that the use of "deserted" in this context was constitutionally protected opinion. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), the United States Supreme Court indicated that some expressions of opinion are entitled to constitutional protection: "We begin with the common ground. Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Id.* at 339–40, 94 S.Ct. at 3007, 41 L.Ed.2d at 805. That language acknowledges the importance of free expression to the political processes of a democratic society and the desirability of competing ideas in furthering democratic goals. In *Bucher v. Roberts, supra,* we recognized the rationale of *Gertz* and the danger in causing liability to occur for defamation in cases where the publisher has advanced an essentially ambiguous statement subject to conflicting interpretations. We said that "[o]nce a court needs to speculate concerning the meaning the statement purports to convey, as must be done here, we enter the area of opinion as opposed to factual assertion." 198 Colo. at 4, 595 P.2d at 241.

 *Bucher,* however, does not immunize all forms of opinion. The court of appeals would consider a statement protected opinion if it concluded that a word may admit more than one meaning. 632 P.2d at 281. Such a test is overbroad. Most words have more than one meaning. Moreover, *Bucher* does not place all allegations of improper motive in a category of unconditionally privileged speech. Such a construction of the case would erect an unconditional privilege for any attack on personal integrity or reputation. While allegations referring to a person's motives may suffer from a certain indefiniteness, a defamation action may be brought in appropriate circumstances. A speaker is not accorded free speech protection for attacks on an individual's reputation interests by framing the attack as "opinion." Neither *Gertz* nor *Bucher* have eliminated all defamation actions based on allegations concerning matters of motive, integrity, and political characterization. *See, e.g., Buckley v. Littell,* 539 F.2d 882 (2d Cir.1976); *Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d 315 (Colo.1981). *See also* Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege,* 34 Rutgers L.Rev. 81 (1981).

In *Bucher,* we cited approvingly *Restatement (Second) of Torts* § 566 (1976).[3] Section 566 contains important limitations on the scope of protected opinion. Comment c of section 566 explains that a plaintiff may recover in defamation if the expressed opinion is based on undisclosed or assumed defamatory facts of which the listener is unaware. The opinion must appear reasonably to the listener to be based on defamatory facts which the reporter has not disclosed to the audience but which the audience can reasonably expect to exist. *See, e.g., Orr v. Argus-Press Co.,* 586 F.2d 1108 (6th Cir.1978); *Ollman v. Evans,* 479 F.Supp. 292 (D.D.C.1979); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980).

The United States Court of Appeals for the Second Circuit adopted an analysis similar to the *Restatement* in *Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.), *cert. denied sub nom. Hotchner v. Doubleday & Co.,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977):

> "Liability for libel may attach, however, when a negative characterization of a person is coupled with a clear but false implication that the author is privy to facts about the person that are unknown to the general reader. If an author represents that he has private, first-hand knowledge which substantiates the opinions he expresses, the expression of opinion becomes as damaging as an assertion of fact."

---

**3.** Section 566 provides:

"A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."

An opinion based on undisclosed facts is contrasted with an opinion which is based on circumstances set forth by the publisher and which support the proffered opinion. *See Restatement (Second) of Torts* § 566, comment b (1976). *Bucher v. Roberts, supra.* See also Note, *Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege, supra.*

Courts have not uniformly applied the distinction between facts and opinions. This is not surprising, considering the necessary indefiniteness of any test which attempts to provide foolproof standards for making the distinction. The surrounding circumstances and factual context of any defamation action will determine whether a fact or an opinion has been published. In *Buckley v. Littell,* 539 F.2d 882 (2d Cir. 1976), for example, the Second Circuit held that the word "fascist" in reference to a well-known columnist was an "opinion" deserving protection. The court concluded, however, that the word "libeller" was "a factual assertion relating to Buckley's journalistic integrity." 539 F.2d at 895–96. The Second Circuit, in a subsequent case, *Cianci v. New Times Publishing Co., supra,* experienced difficulty in applying the distinction it drew in *Buckley* between "fascist" (opinion) and "libeller" (fact). The court said, in commenting on *Buckley:*

> "Since surely [calling Buckley a libeller was] Littell's *opinion,* our decision must mean that when an 'opinion' is something more than a generally derogatory remark but is laden with factual content, such as charging the commission of serious crimes, the First Amendment confers no absolute immunity...."

639 F.2d at 63 (emphasis added). Thus, the Second Circuit recognized the imprecision of clearly defining the difference between fact and opinion and acknowledged that some forms of opinion could provide a basis for a defamation action.

Other courts have recognized that an opinion may have as pernicious and harmful effect as other forms of defamation. The court in *McManus v. Doubleday,* 513 F.Supp. 1383 (S.D.N.Y.1981), relied on *Cianci* to hold that an allegation that a priest has "homicidal tendencies" may support a defamation action. That "opinion" was considered so laden with factual content (and the underlying facts were false) that it was actionable against one who had knowledge of the falsity or probable falsity of the underlying facts but who still published the defamatory remarks. 513 F.Supp. at 1385.

In *Rinaldi v. Holt, Rinehart & Winston, Inc.,* 42 N.Y.2d 369, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977), *cert. denied,* 434 U.S. 969, 98 S.Ct. 514, 54 L.Ed.2d 456 (1977), the allegation that a former supreme court justice was "probably corrupt" was found to be an actionable defamatory statement. The court held that accusations of criminal activity, "even in the form of opinion, are not constitutionally protected." *Id.* at 382, 397 N.Y.S.2d at 951, 366 N.E.2d at 1307. A number of other courts have held that allegations of criminal or non-criminal behavior, expressed as opinion, without an adequate exposition of underlying facts supporting the statement, may support a libel action. *See Kotlikoff v. Community News,* 89 N.J. 62, 444 A.2d 1086 (1982) (facts upon which opinion based fully disclosed); *Pritsker v. Brudnoy,* 8 Media.L.Rep. (BNA) 1754, (Mass.App.Ct.1982) (underlying facts disclosed). *See also Edwards v. National Audubon Society,* 556 F.2d 113 (2d Cir.), *cert. denied,* 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) (accusation that scientists are "paid liars" not opinion); *Hotchner v. Castillo-Puche, supra* (allegations that plaintiff was a "hypocrite" and a "toady" who exhibited "two-faced behavior" could support a libel action); *Brady v. Ottaway Newspapers,* 84 A.D.2d 226, 445 N.Y.S.2d 786 (N.Y.App.Div.1981) (allegation of corruption actionable opinion); *Fields Foundation, Ltd. v. Christensen,* 103 Wis.2d 465, 309 N.W.2d 125 (1981) (statements of dishonorable, unethical or unprofessional conduct of a doctor when phrased as opinion are capable of defamatory meaning); *Good Government Group v. Superior Court,* 22 Cal.3d 672, 586 P.2d 572, 150 Cal.Rptr. 258 (1978) (allegations of "blackmail" and "extortion" actionable if understood as fact).

██ We believe that opinions which imply the existence of an undisclosed defamatory factual predicate may support a cause of action in defamation. If a listener cannot evaluate the alleged defamatory language because no basis for the statement has been disclosed, a defamation action may properly be brought. As one commentator recognized, opinions may lose their constitutional protection when "the average reader or listener or viewer perceives the comment as essentially an assertion of fact, in light of the relative specificity of the language used and the relative insufficiency of the connection of such language to supporting fact." Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum.L.Rev. 1205, 1234 n. 133 (1976) (commenting on *Phoenix Newspapers, Inc. v. Church*, 103 Ariz. 582, 447 P.2d 840 (1968)). *See also* Note, *Fact and Opinion After Gertz v. Robert Welch, Inc: The Evolution of a Privilege, supra.*

██ Allegedly defamatory language must be examined in the context in which it is uttered. It would not be possible for us to establish a hard and fast rule which could govern every situation. Protecting the important competing interests of free speech and reputation requires a flexible approach anchored in the context of each cause of action. In *Information Control Corp. v. Genesis One Computer Corp.,* 611 F.2d 781 (9th Cir.1980), the Ninth Circuit adopted an analysis which identified three factors to examine when speech which might be considered protected opinion is in issue: First, whether the statement complained of is "cautiously phrased in terms of apparency." *Id.* at 784. For example, the use of "in my opinion," while not determinative, may provide the reasonable listener with grounds to discount that which follows.[4] Second, the entire published statement must be examined in context, not just the objectionable word or phrase. Third, all the circumstances surrounding the statement, including the medium through which it is disseminated and the audience to whom it is directed, should be considered. We find the Ninth Circuit's approach a better way to protect both free speech and reputation than the test applied by the court of appeals in this case.

The respondent's statement that Mrs. Burns "deserted" her husband after he was injured was not supported by disclosed facts or circumstances which would allow an average listener to evaluate the purported opinion. In this context, reasonable people could have believed that the reporter had inside knowledge of the facts which would support her charge that Mrs. Burns "deserted" Jack Burns. The broadcast reported nothing about the circumstances surrounding Mrs. Burns' divorce; the story only presented the reporter's view of what effect the accident had on Jack Burns' life. The undisclosed circumstances would be crucial to a proper understanding of the marital relationship between Jack Burns and his former wife.

██ The statement broadcasted by McGraw-Hill could have been interpreted by a substantial number of members of the community and by the jury as a statement of fact susceptible to proof or disproof. A false statement of defamatory fact may support a defamation action. *Buckley v. Littell, supra; Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d 315 (Colo.1981). Even if the statement could be characterized as an opinion, it will support a defamation action if the language is defamatory and the underlying defamatory facts which provide a basis for the opinion are false and are not disclosed in the context of the broadcast. *Cianci v. New Times Publishing Co., supra; McManus v. Doubleday, supra; Restatement (Second) of Torts* § 566 (1976).

4. Language of apparency is a factor, though it cannot be determinative. Merely by prefacing a defamatory remark with the phrase "in my opinion" should not be a complete shield to responsibility for defamation. As Judge Friendly noted: "It would be destructive of the law of libel if a writer could escape liability for accusations of crime simply by using, explicitly or implicitly, the words "I think." *Cianci v. New Times Publishing Co.,* 639 F.2d at 64. *See also Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege,* 34 Rutgers Rev. 81, 107–08 (1981).

The opinion was thus not unconditionally protected under the United States or Colorado Constitutions.

■ Both *Bucher v. Roberts, supra,* and *Burns v. Denver Post, Inc., supra,* are distinguishable in that the challenged statements did not contain defamatory falsehoods. The context of each allegedly defamatory communication was fully and clearly disclosed in those cases so that the listener or viewer could evaluate the statements. We believe that the jury in this case was reasonable in finding that Mrs. Burns had been libeled by the false representation of her relationship with her husband.

### IV.

### *Reckless Disregard*

■ We have held that the news media's reporting of a "matter of public or general concern" is protected unless the alleged defamatory statements are made with actual malice; in other words, with knowledge that the statement was false or with reckless disregard of whether it was false or not. *Diversified Management, Inc. v. Denver Post, Inc.,* 653 P.2d 1103 (Colo.1982). *See also New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d 315 (Colo.1981); *DiLeo v. Koltnow,* 200 Colo. 119, 613 P.2d 318 (1980); *Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (1975). There is ample evidence in the record to support the conclusion that the respondent had proceeded with reckless disregard of the truth or falsity of the action attributed to Mrs. Burns and the children.

■ In *Diversified Management, Inc. v. Denver Post, Inc., supra,* we held that the appropriate test for reckless disregard was whether there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication," thus adopting the standard expressed in *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). *See Walker v. Colorado Springs Sun,* 188 Colo. 86, 98, 538 P.2d 450, 457 (1975). A key issue to be resolved in determining reckless disregard is the credibility of the reporter or publisher in the context of the surrounding facts and circumstances. The trier of fact must resolve issues of credibility. The burden of proving reckless disregard must be met with convincing clarity. *Diversified Management, Inc. v. Denver Post, supra; Kuhn v. Tribune-Republican Publishing Co., supra; Walker v. Colorado Springs Sun, supra.*

In *Kuhn v. Tribune-Republican Publishing Co., supra,* we held that a newspaper account reporting that city officials had improperly accepted complimentary ski area passes was defamatory. We said that a reasonable jury could find that a reporter acted with reckless disregard for the truth when he admitted that he had no bases for most of his erroneous statements; and when he failed to corroborate allegations even though the story was not under time pressure to be published; and when his investigation of the facts was grossly inadequate because he failed to pursue "obvious available sources of possible corroboration or refutation." 637 P.2d at 319. The reporter's failure to verify defamatory statements in *Kuhn* meant that many of the asserted "facts" were merely fabrications worthy of no First Amendment protection. We held that, in this factual context, "the evidence ... was sufficiently clear and convincing" to sustain a claim for defamation. *Id.* at 319. *See also Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Vandenburg v. Newsweek, Inc.,* 507 F.2d 1024 (5th Cir.1975); *Alioto v. Cowles Communications, Inc.,* 519 F.2d 777 (9th Cir.1975).

Here, a jury could reasonably find with convincing clarity that the defamatory statement was published with reckless disregard of its truth or falsity. The reporter, Marion Brewer, was a college graduate with a communications degree and eight to ten years experience. She had personally interviewed Jack Burns and knew that he was frustrated and bitter over the events surrounding his injuries and the divorce

which was granted after the explosion. Any self-serving description by Burns of the relationship between himself and his wife would warrant careful scrutiny and should have been verified by investigation, and viewed with a healthy degree of skepticism. Brewer, like the reporter in *Kuhn,* failed to investigate other sources of possible corroboration or refutation of her statements. In addition, Brewer was under no time pressure to finish her story; the piece was one part of a feature series on dangerous occupations.

Nevertheless, Brewer testified that she was aware of the marital difficulties of the Burns family before the accident and knew that Mrs. Burns had compelling reasons for divorcing Jack Burns. Brewer knew that Mrs. Burns had filed for divorce before the accident; that there had been a temporary reconciliation before and during Jack Burns' convalescence; and that finally, two years after the accident, Mrs. Burns was granted a divorce. Brewer testified that she had no basis for the use of the defamatory language but consciously chose or accepted the words in the story as an accurate portrayal of the events surrounding Jack Burns' accident. As an experienced reporter, Brewer must also have been aware that the word "deserted," when used in the context of the marital relationship, has an opprobrious connotation in the most common usage of the term. The use of a term with obvious pejorative connotations without underlying factual support is evidence of recklessness especially when the reporter has knowledge that the description is in fact untrue. Brewer knew that Mrs. Burns had not "deserted" Jack Burns in the sense that he was "abandoned" without "warning, permission, or right." Brewer and the station apparently used the word to illustrate more vividly the situation surrounding Jack Burns' accident despite the word's emotional and derogatory connotation when applied to the marital relationship. *See Forrest v. Lynch,* 347 So.2d 1255 (La.App.1977).

■ The evidence in this case supports the jury's conclusion that the respondent published a defamatory statement with reckless disregard for the truth. When one uses language which invites an inference that an individual has acted significantly at variance with community standards, and one fails to provide a factual basis for the derogatory characterization, then one "knowingly risks the likelihood that the statements and inferences are false and thereby forfeits First Amendment protections." *Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d at 319. The jury's finding of liability in this case is reasonable based on the evidence presented at trial and we will not disturb its findings of fact. We cannot conclude as a matter of law that the jury erred in finding liability.

We reverse the decision of the court of appeals and return this case to the court of appeals with directions to remand to the district court for proceedings consistent with the views expressed in this opinion.

DUBOFSKY, J., dissents.

ROVIRA, J., joins in the dissent.

LOHR, J., dissents.

ROVIRA, J., joins in the dissent.

DUBOFSKY, Justice, dissenting:

I respectfully dissent. Because I believe that the defendant's statement was nondefamatory and could not have been published with reckless disregard of its truth, I would affirm the judgment of the court of appeals.

I.

My conclusion that the defendant did not intend a defamatory meaning and that the statement in fact did not carry one requires a brief review of facts not set out in the majority opinion. Yvonne Burns first filed a divorce action in January, 1972. She and Jack Burns reconciled prior to the accident and Mr. Burns moved back with the family. The accident which disabled Mr. Burns did not occur until several months later. Mrs. Burns moved out of the house in November, 1973, after Mr. Burns had regained some of his sight, hearing, and ability to live independently. Mrs. Burns obtained an uncon-

tested divorce in April, 1974. The Burns' 12 year old daughter and 15 year old son chose to live with their mother. The couple's three other sons, aged 17, 16, and 13, initially chose to stay with their father. Over the course of the next two years, all of the children gave up living with their father.[1] When the camera crew visited Mr. Burns in the family home in 1976 to film the interview which is the subject of this action, neither Mrs. Burns nor the children were living there.

The story about Jack Burns was one in a series examining the motivations for and ramifications of holding an ultrahazardous job. The reporter who interviewed Burns testified to Burns' special concern with the need for rehabilitation benefits and family psychiatric coverage in cases such as his. Burns' insights thus matched what the reporter testified was an intended goal of the story—to alert employers and workers alike to the necessity of such benefits for those employed in dangerous occupations.

Burns described his post-accident problems to the reporter. At trial, Burns testified that he was not critical of his family for acting as they did. Rather, he regretted never having discussed the possibility of an accident with his family and testified at trial that he had confided to the reporter that "I know what it feels like to be deserted."

It was that final exchange which the reporter recounted in her brief introduction to the footage of the accident.[2] The reporter testified that she understood and later rephrased these comments in the same noncritical manner which Burns had used in relating them to her.[3] The point of the story was not the motivation for the Burns family break-up; rather, it was the aftermath of a tragic accident.

In determining whether a publication is defamatory, the words must be given that meaning which is ordinarily attached to them by persons familiar with the language. It is not enough that the particular recipient of the communication attaches a defamatory meaning to it. If the defamatory meaning is not intended, it must be a reasonable construction of the language. *Restatement 2d Torts,* § 563 (1976).

Webster's Third International Dictionary (1961) gives four preferred meanings of the verb "desert" before listing one with distinctly derogatory connotations.[4] I simply do not find the majority's citation of an 1889 case from Michigan convincing proof that "desertion" is today a term of universally derogatory connotation. Slip op. at 10. According the verb its most common meaning, it describes precisely the circumstances of Jack Burns' personal life in 1976: his wife and five children had left him.[5]

Desertion has not been a ground for divorce in Colorado since 1971, when Colorado

---

**1.** The record does not indicate what the legal custody arrangements were. All family members spoke in terms of making and changing living arrangements as they chose to.

**2.** The Burns story lasted 3 minutes and 17 seconds; the statement at issue here, delivered by the reporter standing in front of Burns' house, consumed several seconds.

**3.** PLAINTIFFS' ATTORNEY: What does the word "deserted" mean to you?
REPORTER: Left alone.

PLAINTIFFS' ATTORNEY: So in your mind, "desert" has no bad connotation and therefore that's why you didn't hesitate to use it in this ... story?
REPORTER: In the story, no. Didn't have any bad connotations whatsoever. It was a descriptive word.

PLAINTIFFS' ATTORNEY: That wasn't your intent, to be critical in this article?
REPORTER: No, absolutely not.

**4.** "Desert" is defined first as "to withdraw from or leave permanently or less often temporarily"; second as "to turn away from, especially by withdrawing support or disrupting bonds of attachment or duty"; third as "to leave behind or give up"; fourth as "to renounce marital relations by quitting the company of (one's spouse)"; and fifth as "to break away from or break off association with (some matter involving legal or moral obligation . . .): betray".

**5.** The plaintiffs (Mrs. Burns and four of the children) admitted that they had left Mr. Burns by the time of the broadcast.

enacted the Uniform Dissolution of Marriage Act. Colo.Sess.Laws 1971, p. 520, *et seq.*, section 14–10–101 *et seq.*, C.R.S.1973. The Act, which has been adopted by eight states,[6] revised the divorce statute to eliminate all grounds other than irretrievable breakdown of the marriage, section 14–10–102, and provided that marital misconduct should play no part in the disposition of a couple's property. 14–10–113. At least thirty additional states have abrogated desertion as a ground for divorce by their enactment of no-fault statutes.[7] In my view, these provisions are no more than a realistic acknowledgement of a divorce rate so high that it is statistically almost as likely that a marriage will end in divorce as that it will not.[8] As divorce has become widespread and affected much of our population, the stigma associated with leaving one's spouse has nearly vanished. Viewed against that backdrop, I am persuaded that the term "deserted" must be given its non-defamatory meaning.

The use of "deserted" to describe the fact that Burns' family had left him is less pejorative than the use of the term "blackmail" to describe the negotiating tactics of the plaintiff in *Greenbelt Publishing Assn. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970). In *Greenbelt,* the U.S. Supreme Court found that "blackmail" was no more than rhetorical hyperbole loosely descriptive of a bargaining position that some considered unreasonable. *National Association of Letter Carriers v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) reinforced the *Greenbelt* holding. *Austin* held that the word "traitor" in the context of a labor picketing dispute was again mere rhetorical hyperbole. Taken together, *Greenbelt, Austin,* and *Austin*'s companion case, *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) have been

interpreted as creating an unconditional privilege for rhetorical hyperbole in a context where the actual malice standard is appropriate. Note, *Fact and Opinion after Gertz,* 34 *Rutgers L.Rev.* 97 (1981). By its use of "deserted" instead of "left" or "moved out" or "stopped living with", the defendant indulged in a sort of rhetorical hyperbole. Nevertheless, the assertion that "his wife and five children have deserted him" was literally and factually true.

That "left" or "stopped living with" is the more logical of the meanings which can be attributed to the word "deserted" in this context is pointed up by the majority's failure to find any particular defamation of four of the five plaintiffs—the Burns' children. The majority opinion focuses almost entirely on the allegedly defamatory connotation of "deserted" when applied to the actions of Mrs. Burns. This analysis overlooks the point that the word "deserted" was used to describe the actions of the children in leaving as well. If "deserted" has any special defamatory relevance when applied to the relationship of children to a parent, the majority does not mention one.

Further, I find the majority's fact/opinion analysis inapposite. The statement at issue here was an allegation of fact: that Mrs. Burns and the family had deserted (left) Burns since (after) the accident. The defendant did not purport to express an opinion as to why Mrs. Burns—or the children—had deserted Mr. Burns. Had the defendant said that the family deserted Mr. Burns *because of* the accident, we would enter the realm of speculation and opinion. "It is comment to say that a certain act which a man has done is disgraceful or dishonourable; it is an allegation of fact to say that he did the act so criticised." *C. Gatley on Libel and Slander* ¶ 701 (7th ed. R. McEwen & P. Lewis 1974).

---

**6.** Arizona, Colorado, Illinois, Kentucky, Minnesota, Missouri, Montana and Washington. 9A *Uniform Laws Annotated* (Master edition 1979) (1982 Supp.).

**7.** Sepler, Measuring the Effects of No-Fault Divorce Laws Across Fifty States, 15 *Family Law Quarterly* 65, 90–93 (1981).

**8.** Current projections by the U.S. National Center for Health Statistics indicate that 48% of all present marriages will end in divorce. Even this projection may be conservative, however, because it is based on past years and the divorce rate continues to increase. Weitzman, Changing Families, Changing Laws, 5 *Family Advocate* 1 (1982).

Finally, even if the majority could identify the opinion which it finds the defendant to have held, it errs in its application of the standard to test that opinion for defamation. The standard, set out in *Restatement 2d Torts* § 566 (1976), is:

> A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed *defamatory* facts as the basis for the opinion. (Emphasis added.)

If the comment that "his wife and five children have deserted him since the accident" implies the existence of facts which justify that statement, it is the truth of these facts that must be determined. *Restatement 2d Torts* § 581A (1976) comment c. It is undisputed that Yvonne Burns and the couple's children "deserted" Jack Burns in the ordinary dictionary meaning of that word. As the underlying facts are true, the statement is non-defamatory. *Restatement 2d Torts* § 566 (1976).

## II.

Under the standard of *Diversified Management, Inc. v. Denver Post,* 653 P.2d 1103 (Colo.1982) the plaintiffs in this case bore the burden of proving by clear and convincing evidence that the defendant made the disputed statement with knowledge that it was false or with reckless disregard for its falsity.[9] As the majority correctly states, clear and convincing proof of reckless disregard is shown by evidence that a defendant entertained serious doubts as to the truth of the statement. Slip op. at 1361. I do not believe that the plaintiffs did—or could—meet this burden.

In *Herbert v. Lando,* 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) the U.S. Supreme Court held that plaintiffs in defamation actions can depose media defendants to discover an author's state of mind at the time of publication. *Lando* leaves no doubt that the defendant's intent is a critical area of inquiry: "*New York Times* and its progeny made it essential to proving

liability that the plaintiff focus on the conduct and state of mind of the defendant." 441 U.S. at 160, 99 S.Ct. at 1640. The practical effect of this pronouncement is to make inquiry into the subjective state of mind of a defendant an essential element of a media defamation case.

The plaintiffs in this case took the deposition of the reporter who, after researching the story and interviewing Mr. Burns, stated that his family had deserted him. All of this evidence—and it is the only evidence on this point—attests to the reporter's good faith belief that her use of the word "desert" was an accurate, non-derogatory characterization of the fact that Mrs. Burns and the couple's children had chosen to leave and live elsewhere. See footnote 3, *supra.* The reporter's deposition testimony on her own interpretation of the meaning of "to desert" squares with the preferred dictionary definition of that word. See footnotes 3 and 4, *supra.* Thus, the attention to the editorial process which is required of plaintiffs by *Lando* failed to uncover any proof that the defendant believed the statement was either false or derogatory, much less clear and convincing evidence that the defendant entertained serious doubts about the truth of the statement.

By contrasting the facts of this case with those in *Kuhn v. Tribune-Republican Publishing Co.,* 637 P.2d 315 (Colo.1981), the defendant's non-culpable state of mind here is underscored. *Kuhn* found proof of reckless disregard where a reporter had conducted a grossly negligent investigation, fabricating facts and failing to contact obvious sources of information. The statement at issue here was no fabrication. The reporter interviewed several sources and knew that Mrs. Burns and the children had left Mr. Burns. That fact was corroborated by the reporter's visit to Mr. Burns' home. The reporter chose her words to accurately portray both Burns' living situation and his admonition that others evaluate the ramifications of ultrahazardous jobs. These facts make this a vastly different case than

---

**9.** Because of my conclusion that the statement was literally and factually true, analysis of the defendant's knowledge of falsity is not pertinent here.

*Kuhn,* in which the reporter testified that he wrote the story with false implications so as to "humanize" it and did not know or care about the truth of two key factual allegations. 637 P.2d at 318.

Because I find the record devoid of proof that the defendant acted with reckless disregard of the truth in stating that the plaintiffs deserted Mr. Burns, I would affirm the judgment of the court of appeals that the trial court erred in denying the defendant's motion for a directed verdict.

I am authorized to say that Justice RO-VIRA joins me in this dissent.

LOHR, Justice, dissenting:

This defamation case is one more in our series of efforts to strike a constitutionally permissible balance between the freedoms of speech and the press guaranteed by the First Amendment and the protection of an individual's interest in reputation and good name. The majority holds that the statement in a televised news feature that Sgt. Jack Burns' wife and five children deserted him after an accident in which he suffered serious injuries is not constitutionally protected opinion. It also holds that there was clear and convincing evidence to support the jury's finding that the respondent proceeded with reckless disregard of truth or falsity in broadcasting the statement. Because I disagree with each of these conclusions, I respectfully dissent.

### I.

We have recognized that "a crucial distinction exists between false statements of fact which receive no constitutional protection in defamation cases and ideas or opinions which by definition can never be false so as to constitute false statements which are unprotected." *Bucher v. Roberts,* 198 Colo. 1, 3, 595 P.2d 239, 241 (1979); *see Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). "Whether a particular statement constitutes fact or

opinion is a question of law." *Bucher v. Roberts, supra,* 198 Colo. at 3, 595 P.2d at 241.

As the majority in the present case notes, however, *Bucher* did not cast a protective cloak over all statements framed as opinions. *Bucher* cited with approval and applied the following principle found in the *Restatement (Second) of Torts* § 566 (1976):

A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.

It is this principle upon which the majority relies in ruling that the language at issue here is actionable. It concludes that the statement "that Mrs. Burns 'deserted' her husband after he was injured was not supported by disclosed facts or circumstances which would allow an average listener to evaluate the purported opinion." (Slip op. at 1360.)[1] Even assuming that "deserted" has a defamatory connotation in this context,[2] I see nothing in this brief news story that would lead a viewer to conclude that the opinion that the family "deserted" Sgt. Burns was based on "inside knowledge" of "undisclosed circumstances." (Slip op. at 1360.) Rather, the desertion statement is more naturally understood as the expression of an unrefined value judgment: there is no justification for a family to leave a husband and father who finds himself severely disabled as the result of an accident. I find in the text of the broadcast no suggestion, express or implied, that the desertion conclusion was based on more information, or on a more sophisticated analysis of the familial relationships, than that. The validity of this opinion depends upon the standards and values of the listener and viewer. Each learns the basis of the opinion from the broadcast and can independently assess whether it is sound or simplistic. Therefore, § 566 of the *Restatement (Second) of Torts* has no application.

---

1. See part I of the majority opinion for the text of the statement at issue here.

2. Justice Dubofsky argues ably in dissent that "desert" in this context simply means "leave," and so is not defamatory at all.

The majority suggests in the alternative that the statement at issue here may be fact and not opinion. I cannot agree. Accepting the majority's holding that "desert" has derogatory connotations, the statement includes the judgment that it is unjustifiable for a family to leave a severely disabled husband and father under any circumstances. Unless there can be said to be a generally accepted community standard supporting this conclusion—and I do not believe there can—it necessarily represents a debatable value judgment. See Note, Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege, 34 Rutgers L.Rev. 81, 100 (1981); Keeton, Defamation and Freedom of the Press, 54 Tex.L. Rev. 1221, 1235 et seq. (1976). I simply cannot accept the majority's conclusion that, with her more extensive knowledge of the relationship between Mr. and Mrs. Burns, the reporter "knew" that it was in fact untrue that Mrs. Burns and the children abandoned Mr. Burns without justification or right. (Slip op. at 1362.) This is not a knowable fact, but an expression of a value judgment—a constitutionally protected opinion.[3]

## II.

Even if the majority were correct that the statement that Mrs. Burns and the children deserted Mr. Burns enjoys no constitutional protection as a statement of opinion, I do not believe that the plaintiff met her burden of proof that the statement was made with the knowledge it was false or with reckless disregard for its truth or falsity. See Diversified Management, Inc. v. Denver Post, Inc., 653 P.2d 1103 (Colo.1982). A finding of reckless disregard requires that there is "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968); Diversified Man-

agement, Inc. v. Denver Post, supra. Although, as the majority notes, the jury must determine the credibility of the witnesses, this does not relieve us of our responsibility to ensure protection of First Amendment freedoms by evaluating independently whether the evidence presented to the jury in support of the plaintiff's claim of reckless disregard for the truth was clear and convincing. See New York Times v. Sullivan, 376 U.S. 254, 285, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964); DiLeo v. Koltnow, 200 Colo. 119, 613 P.2d 318 (1980). I find nothing in the record to support a conclusion by a clear and convincing standard that the defendant entertained a serious doubt about truth or falsity in the selection of the single word "deserted," included in a one-time broadcast, to describe the manner in which the family members separated.

## III.

In our past decisions we have recognized that the First Amendment freedoms require breathing room and that it is necessary to impose strict tests on those seeking recovery for defamation against a news media defendant in order to avoid a chilling effect on robust debate inconsistent with the freedom of speech and of the press. E.g., Diversified Management, Inc. v. Denver Post, supra; DiLeo v. Koltnow, supra; Walker v. Colorado Springs Sun, Inc., 188 Colo. 86, 538 P.2d 450 (1975). As the United States Court of Appeals for the Second Circuit has said, in a defamation case involving publication of a book:

These strict tests may sometimes yield harsh results. Individuals who are defamed may be left without compensation. But excessive self-censorship ... would be a more dangerous evil. Protection and encouragement of writing and publishing, however controversial, is of prime importance to the enjoyment of first amend-

---

**3.** As Justice Dubofsky notes in her separate dissent, the desertion statement can also be understood not as a statement of fact but as rhetorical hyperbole, constitutionally protected under Greenbelt Cooperative Publishing Ass'n

v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6, (1970) and National Assoc. of Letter Carriers v. Austin, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974).

ment freedoms. Any risk that full and vigorous exposition and expression of opinion on matters of public interest may be stifled must be given great weight. In areas of doubt and conflicting considerations, it is thought better to err on the side of free speech.

*Hotchner v. Castillo-Puche,* 551 F.2d 910, 913 (2d Cir.1977).

I would affirm the judgment of the Colorado Court of Appeals.

I am authorized to say that Justice ROVIRA joins in this dissent.