Adrian BROOKS, Plaintiff–Appellant,

v.

Woodrow PAIGE, Jr., and WGN of Colorado, Inc., a Colorado corporation, Defendants–Appellees.

No. 86CA0651.

Colorado Court of Appeals, Div. A.

Dec. 11, 1988.

As Modified on Denial of Rehearing Jan. 19, 1989.

Certiorari Denied May 30, 1989.

Case & Lacerte, John Case, Dennis A. Lacerte, Denver, for plaintiff-appellant.

Cooper & Kelley, P.C., Thomas B. Kelley, Frank R. Kennedy, Denver, for defendants-appellees.

KELLY, Chief Judge.

The plaintiff, Adrian Brooks, appeals the trial court's dismissal of his claims for defamation and outrageous conduct against the defendants, Woodrow Paige, Jr., and WGN of Colorado, Inc. He contends the trial court erred in concluding, as a matter of law, that the statements and conduct complained of were neither defamatory nor outrageous in reference to Brooks, a professional athlete. We affirm.

Brooks is a professional soccer player. On April 26, 1980, he signed a two-year contract with the Denver Avalanche, a team in the Major Indoor Soccer League (MISL). Brooks became a star player for the Avalanche, was appointed team co-captain, and was a leading scorer for the team. In 1981, Brooks was selected for the MISL All–Star team and was voted most valuable player in the All–Star game. By virtue of

these facts, Brooks concedes his status as a public figure within the Denver sports community.

Although Brooks' contract with the Avalanche expired by its own terms at the end of the regular season on April 25, 1982, it included an option clause for the following season beginning in October. However, Brooks and the team were unable to negotiate a new agreement before his original contract expired, and Brooks deemed himself a free agent. Meanwhile, the Avalanche had qualified for the 1982 post-season MISL playoffs. The MISL players' union advised Brooks not to participate in the playoffs until he had negotiated a new contract with the Avalanche. The team offered Brooks an extension on his old contract on a per diem basis, which amounted to $72 per day, until the playoffs were over. Brooks expressed his desire to play, but demanded a full month's salary ($2,166) to do so, or alternatively $619 per game. No agreement was reached, and Brooks did not play. The Avalanche was eliminated from the playoffs on April 30, 1982, after three games.

During this time, several articles appeared in the sports sections of both of Denver's daily newspapers concerning the contract dispute between Brooks and the Avalanche and the fact that Brooks did not play in the playoffs. One such article, for which Brooks' attorney was interviewed, was entitled "Brooks' Contract Woes Explained." This article, published in the Denver Post on May 2, 1982, purported to give Brooks' side of the story, including the specifics of Brooks' counteroffer to the Avalanche.

That same day, WGN televised its weekly talk show called "Sports Connection." The regular format for the show included commentary on sports topics by a panel of sports media personalities, including Paige. Approximately three minutes of the half-hour broadcast on May 2 were devoted to commentary on Brooks' troubles with the Avalanche.

During the show, a life-size photograph of Brooks in his team uniform was present on the set. After turning the photograph

away from the camera, Paige stated: "If the guy's gonna back out on our favorite team, the Avalanche, to hell with him! His picture shouldn't be on this set!" Paige then asked another commentator, Jim Conrad, to explain Brooks' situation. Conrad, who later acknowledged having read the Denver Post article before the show, summed up the situation as follows:

"Adrian, as simply as I can put it ... his contract apparently expired. The Avalanche think that they have ... an extension clause where they can pick it up with ten percent ... above what he was making. Brooks and his agent apparently feel that this is not the case ... that he is a free agent, so he's not playing."

The panel then engaged in a free-for-all discussion that included such statements as "whatever happened to playing for the team? ... that was my first reaction"; "Adrian Brooks quit the Avalanche"; and "get him the hell out of town." At the end of the broadcast, Paige took the photograph of Brooks, drew a mustache and beard on it, spat on the photograph, laid it on the floor and jumped on it, then threw it off the set.

Brooks was watching the show at home with his wife. He claims to have suffered severe emotional distress as a result of watching the broadcast. Evidence adduced at trial shows he became introverted and unable to sleep and lost confidence in his ability to play soccer. Although traded to another team, he never regained his earlier prominence in the sport.

In his complaint, Brooks stated five claims for relief, three of which were premised on the argument that the words "quit" and "back out," as well as Paige's conduct, were defamatory to Brooks. The remaining two claims alleged intentional infliction of emotional distress by outrageous conduct and sought exemplary damages. The trial court partially granted the defendants' motion for summary judgment, dismissing the three defamation claims prior to trial. At the close of the defendants' case-in-chief, the court dismissed the two remaining claims.

## I.

■ Brooks contends that the trial court erred in entering summary judgment dismissing his defamation claims because reasonable persons could conclude that the terms "quit" and "back out" were defamatory under the circumstances. However, we conclude as a matter of law that these statements constitute opinion meriting constitutional protection, and thus, the defamation claims were properly dismissed.

■ A statement may be defamatory "if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351 (Colo.1983) (quoting Restatement (Second) of Torts § 559 (1976)). "A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis of the opinion." *Bucher v. Roberts*, 198 Colo. 1, 595 P.2d 239 (1979) (quoting Restatement (Second) of Torts § 566 (1976)). An opinion, even though erroneous, is constitutionally protected and may not be the subject of a private defamation action provided that the truthful facts supporting the opinion are set forth. *Bucher v. Roberts, supra.*

■ Whether a particular statement constitutes fact or opinion is a question of law. *Bucher v. Roberts, supra.* Although a particular comment might appear on its face to be a statement of fact, when considered in context it may otherwise be revealed to be mere rhetorical hyperbole, not intended to be understood in its literal sense. *Lane v. Arkansas Valley Publishing Co.*, 675 P.2d 747 (Colo.App.1983).

The Colorado Supreme Court has adopted a three-part analysis that is applicable when speech that might be considered protected opinion is in issue: (1) the statement complained of should be examined to determine if it is "cautiously phrased in terms of apparency" (*e.g.*, "in my opinion"); (2) the entire published statement must be examined in context, not just

the objectionable word or phrase; and (3) all the circumstances surrounding the statement, including the medium through which it is disseminated and the audience to whom it is directed, should be considered. *Burns v. McGraw–Hill, supra.*

Here, the statements that Brooks had "quit" and "back[ed] out on our favorite team" were made during a live television broadcast of a local sports talk show and were directed to a sports-minded audience. The show's format was intended to include commentary on current sports topics, and the show aired at a time when a good deal of local sports media attention had already been paid to Brooks' contract dispute. It is true that the show failed to state expressly that Brooks had offered to play for a higher amount than the team offered. However, this was implicit in Conrad's explanation of the contract dispute. Moreover, the discussion was couched in "terms of apparency" such as "apparently" and "that was my first reaction."

Considered as a whole, these circumstances provided a sufficient basis for the audience to evaluate and form an opinion independent of the comments of the sportscasters. *See Burns v. McGraw–Hill, supra* (if listener cannot evaluate alleged defamatory language because no basis for statement has been disclosed, a defamation action may properly be brought). Accordingly, we conclude that the statements here that Brooks had "quit" and "back[ed] out" on his team constitute opinion as a matter of law.

"A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is." *Bucher v. Roberts, supra* (quoting Restatement (Second) of Torts § 566 (1976)). The fact that Brooks had made a counteroffer, although undisclosed, was not itself defamatory; nor would its reporting have "changed the tone" of the broadcast, given that the contract dispute was reported. *See Pietrafeso v. D.P.I., Inc.,* 757 P.2d 1113 (Colo.App.1988). We could speculate that the sportscasters'

statements, even if "unjustified and unreasonable," were an expression of their belief that Brooks' inability to reach agreement with the team and consequent refusal to play were unreasonable and tantamount to quitting. However, "Once a court needs to speculate concerning the meaning the statement purports to convey, ... [it enters] the area of opinion as opposed to factual assertion." *Bucher v. Roberts, supra.*

Finally, Brooks is a public figure. A public figure "can ... recover damages for a defamatory statement concerning his ... conduct [only] by presenting clear and convincing proof that the statement was made with actual malice." *DiLeo v. Koltnow,* 200 Colo. 119, 613 P.2d 318 (1980). "Actual malice" means that the defamatory statement was known to be false or made with reckless disregard of whether it was true or false. *DiLeo v. Koltnow, supra.* A showing of "reckless disregard" requires sufficient evidence to demonstrate that the defendant in fact entertained serious doubts as to the truth of the published statement. *Diversified Management, Inc. v. Denver Post, Inc.,* 653 P.2d 1103 (Colo. 1982). In contrast, the "quit" and "back out" statements here were not deliberate or reckless falsehoods, but merely rhetorical hyperbole, opinions meriting constitutional protection. *See Bucher v. Roberts, supra.*

## II.

Brooks also contends that the trial court erred in not allowing his outrageous conduct and exemplary damages claims to go to the jury because Paige's behavior was "more than speech" and a reasonable juror could find it outrageous. We disagree.

Although the question whether conduct is sufficiently outrageous is ordinarily a jury question, it is for the court to determine in the first instance whether reasonable persons could differ on the outrageousness issue. *Zalnis v. Thoroughbred Datsun Car Co.,* 645 P.2d 292 (Colo. App.1982).

The behavior Brooks complains of is Paige's drawing, spitting, and jumping on a photographic image of Brooks in uniform. Drawing, spitting, and jumping are neutral acts, however. When directed at some inanimate object, these acts may seem juvenile, impolite, or disrespectful, but they are not inherently outrageous. They gain significance only from the ideas they express in context. *See People v. Vaughan,* 183 Colo. 40, 514 P.2d 1318 (1973); *State v. Anonymous,* 34 Conn.Supp. 575, 377 A.2d 1342 (1977).

The idea expressed here is a sports commentator's displeasure with a professional athlete's failure to settle a contract dispute in time to join his team in the post-season playoffs. *No* idea, or at least a very different one, would have been expressed had Paige drawn, spat, or jumped on a blank sheet of cardboard. Thus, Brooks' outrageous conduct claim concerns the "speech component" or "communicative impact" of Paige's behavior. *See State v. Anonymous, supra; cf. United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968).

*Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) is instructive on the issue whether a public figure may maintain a claim for outrageous conduct premised on expressive behavior. In that case, Hustler Magazine had printed a parody of an advertisement depicting the Rev. Jerry Falwell in a drunken incestuous rendezvous with his mother in an outhouse. It was undisputed that Falwell was a public figure, and the Court noted that Falwell was "a nationally known minister who has been active as a commentator on politics and public affairs."

In reversing the Fourth Circuit's affirmance of the District Court's directed verdict in favor of Falwell, the Supreme Court held that "public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with 'actual malice,' *i.e.,* with knowledge that the statement was false or with reckless disregard as to whether or not it was true."

In so holding, the Court stated:

"Generally speaking the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently 'outrageous.' But in the world of debate about political affairs, many things done with motives that are less than admirable are protected by the First Amendment.

. . . . .

'Outrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An 'outrageousness' standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience."

*Hustler Magazine v. Falwell, supra.*

We adopt this rationale and hold that a public figure may not maintain a claim for outrageous conduct when the conduct complained of is expressive behavior directed at his "public persona." Here, it was Brooks' public persona that was assailed because Paige directed his expressive behavior at Brooks' image as a professional athlete who, because of widely-reported contract dispute, refused to play with his team in a post-season playoff series. Thus, Brooks' outrageous conduct claim must fail.

In reaching this conclusion, we note that Brooks is a public figure only insofar as he was a professional soccer player in the MISL, and that his contract dispute was a matter of public or general concern within the league and the Denver sports community. *See Diversified Management, Inc. v. Denver Post, Inc., supra; DiLeo v. Koltnow, supra.* This case does not present the issue whether Brooks might have maintained a claim for outrageous conduct had

the offensive behavior been directed at some nonpublic aspect of his life.

### III.

▆ Finally, we reject Brooks' contention that, because of the disparate financial circumstances of the parties, the trial court erred in awarding costs to the defendants. The award of costs was within the discretion of the trial court under C.R.C.P. 54(d). *Rossmiller v. Romero,* 625 P.2d 1029 (Colo. 1981).

Because of our disposition of these issues, it is unnecessary for us to consider Brooks' remaining assignments of error.

JUDGMENT AFFIRMED.

METZGER and FISCHBACH, JJ., concur.